# In the United States Court of Federal Claims

**No. 21-1529C**
**Filed: September 4, 2021**
**Redacted Version Issued for Publication: September 30, 2021[1]**

* * * * * * * * * * * * * * * *     *

|  |  |
|---|---|
| **AGILE-BOT II, LLC,** | * |
| | * |
| **Protestor,** | * |
| | * |
| **v.** | * |
| | * |
| **UNITED STATES,** | * |
| | * |
| **Defendant,** | * |
| | * |
| **v.** | * |
| | * |
| **SECURIGENCE, LLC,** | * |
| | * |
| **Defendant-Intervenor.** | * |
| | * |

* * * * * * * * * * * * * * * *     *

**Paul A. Debolt,** Venable, LLP, Washington, DC for protestor. With him were **Spencer Williams, Lindsay Reed**, and **Taylor Hillman**, Venable, LLP, Washington, DC.

**Bryan M. Byrd**, Department of Justice, Washington, DC, Trial Attorney, Commercial Litigation Branch, Civil Division, for defendant. With him were **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Martin F. Hockey, Jr.**, Acting Director, Commercial Litigation Branch, and **Brian M. Boynton**, Acting Assistant Attorney General, Civil Division. **Christinalynn E. McCoy** and **Geraldine Chanel**, of counsel.

**David S. Black**, Holland & Knight LLP, Tysons, VA for intervenor. With him were **Greg Hallmark** and **Amy Fuentes**, Holland & Knight LLP, Tysons, VA.

**O P I N I O N**

<u>**HORN, J.**</u>

In the above-captioned post-award bid protest, protestor Agile Bot II, LLC (ABII) challenges the decision of the Defense Advanced Research Projects Agency (DARPA)

---

[1] This Opinion was issued under seal on September 4, 2021. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

to award a contract to intervenor, SecuriGence, LLC (SecuriGence), arguing that the award was "arbitrary and capricious." Given the urgency identified by the agency for resolution of this protest, this Opinion memorializes the oral decision issued by the court on August 30, 2021, which granted defendant's and intervenor's cross-motions for judgment on the amended Administrative Record and denied protestor's motion for judgment on the amended Administrative Record, which was effective immediately at the time of the oral decision.

## FINDINGS OF FACT

On March 23, 2020, DARPA issued Request for Quotations No. HR001120Q0002 (the RFQ) as a total small business set-aside,[2] seeking proposals for "entire range of IT services, support, engineering, and infrastructure necessary to implement the DARPA IT operational, mission, and research objectives." The RFQ contemplated the issuance of a task order on a hybrid fixed-price award fee, time-and-material, and labor-hour basis, with a one-year base period and eight one-year options.

The RFQ explained: "The Government intends to award one (1) standalone task order to the Quoter determined to be the best value to the Government. The best value determination will be made using a trade-off analysis of all Phase I and II evaluation factors in accordance with methodology specified in this solicitation." For Phase I, the RFQ stated:

> *Factor 1 – Essential Capabilities Experience*
> The Quoter will be evaluated on their past experience working in an unclassified Gov-Cloud environment. The Quoter will be evaluated on their past experience working in a classified multi-level security environment. The Quoter will be evaluated on their DoD-approved multi-level security vendor solution and its rationale for why it is relevant. Providing a solution with which the Quoter has experience will be rated higher. Past experience will only be considered as acceptable (recent and relevant) if it has been performed since January 1, 2015, and includes minimums of 2000 users and 300 remote sites across multiple systems. If a Quoter's stated experience is based all or in part on their subcontractor's experience, the Quoter will be evaluated on their description of the subcontractor's intended role performing this work under the resultant contract in the performance confidence assessment rating.

(emphasis in original). The RFQ continued: "For Phase I, there is one evaluation factor, and no subfactors, stated or unstated. The Government evaluators, however, may use their professional judgment and experience in rating quotations for Phase I." Factor 1 was evaluated on the following ratings: Substantial Confidence, Satisfactory Confidence, Neutral Confidence, Limited Confidence, and No Confidence. For the Phase II Evaluation Criteria, the RFQ indicated:

---

[2] The RFQ was amended three times, most recently on June 29, 2020.

The Government will use the following evaluation factors to evaluate quotations:

Factor 1: Essential Capabilities Experience
Factor 2: Technical Approach
Factor 3: Management Approach
Factor 4: Key Personnel
Factor 5: Past Performance
Factor 6: Supply Chain Risk Mitigation Plan
Factor 7: Price/Cost (Reasonableness/Realism)

Factor 1 is the most important evaluation factor and is more important than combined Factors 2-6. Factors 2-6 are listed in descending order of importance. Non-price/cost Factors 1-6 combined are significantly more important than price/cost Factor 7. The importance of price/cost Factor 7, however, will increase as non-price/cost Factors 1-6 of quotations become closer in merit. For Phase II, there are no subfactors, stated or unstated. The Government evaluators, however, may use their professional judgement and experience in rating quotations for Phase II. Quoters' Phase I Evaluation Factor 1 rating will be included in the overall Phase II trade-off evaluation.

For "Factor 2: Technical Approach," the RFQ explained that "[q]uoters will be evaluated on how well their technical approaches will fulfill all of the requirements of all requirements of the exemplar PWS sections/subsections demonstrating the ability to successfully perform all contract requirements," and for "Factor 3: Management Approach," the RFQ stated "[t]he Quoter will be evaluated on how well their management approach demonstrates their ability to successfully manage all requirements of the task order." Regarding "Factor 4: Key Personnel," the RFQ indicated that a quoter will be "evaluated on how well the Key Personnel demonstrate appropriate qualifications, education, and experience for the work they will be accomplishing. Relevant DARPA or related Government IT experience will be rated higher. Current employment with the prime contractor or quoted subcontractor or letter of intent will be rated higher." For "Factor 6: Supply Chain Risk Mitigation Plan," the RFQ indicated: "The Quoter will be evaluated on how well their plan mitigates supply chain risk for the Government," and "Based on its evaluation, the Government will assign each Quoter a rating of High Confidence, Medium Confidence, or Low Confidence for each Factor 2, 3, 4, and 6 as outlined in the table below:"

| CONFIDENCE RATING | DESCRIPTION |
| --- | --- |
| High Confidence | The Government has high confidence that the Quoter understands the requirement, proposes a sound approach, and will be successful in performing the task order. |
| Medium Confidence | The Government has some confidence that the Quoter understands the requirement, proposes a sound approach, and will be successful in performing the task order. |
| Low Confidence | The Government has low confidence that the Quoter understands the requirement, proposes a sound approach, and will be successful in performing the task order. |

For Factor 5: Past Performance," the RFQ stated, "[q]uoters will be evaluated on their probability of meeting all of the solicitation requirements, including the PWS [Performance Work Statement]. The past performance evaluation will consider each Quoter's demonstrated recent and relevant record of performance in supplying services that meet the task order's requirements." Like Factor 1, past performance evaluations utilized the confidence assessment ratings of Substantial Confidence, Satisfactory Confidence, Neutral Confidence, Limited Confidence, and No Confidence.

For "Factor 7: Price/Cost," the RFQ explained:

No adjectival ratings will be utilized for evaluating price. Price analysis will include a determination of whether the quoted price is fair and reasonable using the proposal analysis techniques at FAR 15.404-1 in accordance with DoD Class Deviation 2014-O0011. Comparison of proposed prices is expected to satisfy the requirement to perform a price analysis since competition normally establishes price reasonableness (FAR 15.404-1(a)(2)(i)). However, the Government may use various price analysis techniques described in FAR 15.404-1 to evaluate whether the proposed price is fair and reasonable. ODC/Travel CLIN prices provided by the Government, Labor award fee pool totals required to be 3% of quoted Labor fixed price totals, and Surge CLIN prices required to be 3% of quoted Labor fixed price totals will only be evaluated as part of the total evaluated price. Quoted maximum on-site and off-site Labor Hour (LH) rates for all personnel descriptions will be evaluated for reasonableness.

Cost realism will be limited to the Fixed Price portion of the quotation and analyzed to evaluate whether the proposed cost elements are realistic for the work to be performed, reflect a clear understanding of the requirements, and are consistent with the unique methods of performance described in the Quoter's technical quotation. If a Quoter fails to provide adequate information to support a cost realism analysis, their quotation may be found unrealistic and unawardable. Negative consequences may result from a Quoter proposing a cost that is too low, including a High Risk performance risk rating or elimination of quotation. The results of the cost realism analysis will be used to determine a performance risk of Low, Medium, or High as outlined in the table below:

4

| PERFORMANCE RISK RATING | DESCRIPTION |
|---|---|
| Low Risk | Negligible potential to cause degradation of performance or issues with retention and recruitment of personnel. |
| Medium Risk | Some potential to cause degradation of performance or issues with retention and recruitment of personnel. |
| High Risk | Likely to cause degradation of performance or issues with retention and recruitment of personnel. |

Regarding discussions, the RFQ specifically indicated that

[t]he Government reserves the right to make an award without communications with Quoters. The Government reserves the right to communicate with Quoters after receipt of quotes to clarify or resolve any minor or clerical discrepancies (as deemed by the Contracting Officer). Clarifications and/or resolution of minor discrepancies are not considered alterations to quotes. The Government also reserves the right to hold exchanges with one or all Quoters. Exchanges are anything that results in an alteration to a quote.

After evaluations, DARPA initially made an award to SecuriGence on October 9, 2020, but on October 16, 2020, ABII filed a protest with the United States Government Accountability Office (GAO). ABII subsequently filed a supplemental GAO protest on October 19, 2020. After DARPA indicated to the GAO that the agency intended to take corrective action, the GAO dismissed the protest on October 27, 2020. After the GAO dismissed the protest, DARPA informed ABII, SecuriGence, and [redacted] of the corrective action and explained that DARPA would engage in discussions with the offerors via Exchange Notices on November 18, 2020. The Exchange Notices indicated:

The Defense Advanced Research Projects Agency (DARPA) recently took corrective action following a protest filed with the Government Accountability Office for the subject RFQ. After re-evaluating quotes, I have decided to engage in exchanges with all Phase II Quoters as authorized by RFQ Attachment 3, paragraph 1. The attached exchange notice notifies you of exchanges for your quote. You may address the attached exchange notice by providing a final quote revision. However, final quote revisions are limited to changes that are within the scope of the attached exchange notice. Any price/cost changes must fully explain how such changes have a clear nexus to and are materially impacted by the attached exchange notice. Any final quote revisions that change aspects of the quote outside the scope of the attached exchange notice will be deemed non-compliant and not evaluated by DARPA.

On November 23, 2020, ABII, SecuriGence, and [redacted] all submitted questions to DARPA, and on November 27, 2020, DARPA responded to the questions. Relevant to the above captioned protest, one exchange between ABII and DARPA was as follows:

> To assist us with mitigating any assumed operational risk or burden with this proposed fluctuation in Fee/Profit, ABII respectfully requests the Government confirm offerors are indeed allowed to make changes to their proposed Base Fee.

> - Yes the government confirms that an increase in proposed base fee has a clear nexus to removing award fee from the commodity CLINs with respect to overall operational risk and would therefore be a permitted change to the quote.

On December 7, 2020, all three offerors submitted final, revised proposals. Included with ABII's was the following note:

> ABII deviated from RFQ instructions by editing a formula contained within the Government-provided spreadsheet. ABII added [redacted]% award fee to the Commodity IT Support Services.

> o **Response:**
> Per the Government's instructions, ABII has corrected our pricing model to remove the [redacted]% award fee related to the Commodity IT Support Services costs. ***This reduced our price/cost by a total of $***[redacted]***.*** The affected cells are highlighted in yellow under the CLIN Totals tab (Row 7, 8 and 11; Columns E, G, I, K, M, O, Q, S, U and V) in **DARPA MSO ITD MNSS - Volume IV - Agile-Bot II.xlsx.** In addition, the removal of the [redacted]% award fee from the Commodity IT Support Services has materially impacted our overall Price/Cost Proposal strategy. The following paragraphs explain how the removal of the [redacted]% award fee has a material impact on and clear nexus to the Exchange Notice.

> **Consequential Material Impact: Net Impact is a proposed savings of $**[redacted]**).**

> ABII's internal proposal pricing standard practices require us to provide balanced pricing to our customers, such that all work requirements under the same contract have the same fee/profit across CLINs, with the exception of cost reimbursement CLINs (such as Travel and ODCs). ABII has historically found that sound operational focus and exceptional technical support is better realized through a balanced fee approach. This way the Program Manager can focus his or her attention on the core mission instead of on internal Profit & Loss (P&L) statements. In accordance with our standard practices, we have reduced the Base Fee on the Multi-Network Support costs from [redacted]% to [redacted]%. The combined total fee for

the Multi-Network Support is now set at [redacted]% ([redacted]% Base Fee and [redacted]% Award Fee). The Commodity IT Base Fee remains at [redacted]% ([redacted]% Base Fee and [redacted]% Award Fee per the Exchange Notice). ***In summary, both total/combined fee maximums (Base Fee plus Award Fee) for Commodity IT and Multi-Network are now at** [redacted]**%, which results in a balanced application of fee/profit that is consistent with our standard practices.*** This change does not create risk for DARPA, since there have been no adjustments to proposed salaries, proposed staffing levels or man-year hours beyond the adjustment to the Quality Manager salary discussed in the next Exchange. The changes are highlighted in yellow in Column X in the following tabs: Base Period, Option Period 1, Option Period 2, Option Period 3, Option Period 4, Option Period 5, Option Period 6, Option Period 7, Option Period 8. In addition, under the CLIN Totals tab (Row 3, 4, 5 and 10; Columns E, G, I, K, M, O, Q, S, U and V). ***The reduction in Base Fee for the Multi-Network Support costs reduced our price by $**[redacted]**.***

(all emphasis in original).

In response to protestor's revised proposal, the contracting officer filed a February 10, 2021 Memorandum for Record with the subject line: "Rejection of Non-Compliant Revised MNSS (Support Services) Base Fee in the Final Quote Revision of Agile-Bot II (ABII)." The February 10, 2021 Memorandum for Record concluded:

After consulting with the price/cost team and reviewing ABII's rationale summarized in paragraph 5 above, I decided to reject ABII's price/cost revision that reduced the quoted fee for MNSS [Multi-Network Support Services] base fee from [redacted]% to [redacted]%. My determination included the following considerations:

a) ABII failed to establish that DARPA's Exchange Notice permitting ABII to revise (reduce) its Commodity IT Services award fee is expected to have a material impact on its MNSS base fee, and that such impact materially requires ABII to also reduce its MNSS base fee. ABII's quoted reduction to its Commodity IT Support Services award fee was not inextricably linked to reducing its quoted reduced MNSS base fees, specifically, reducing the former fee did not inextricably require ABII to also reduce the latter fees. As summarized in paragraph 5 above, ABII stated that it reduced its MNSS base to follow its standard business practices. ABII's internal business practices, however, are inadequate to explain how its decision to revise (reduce) its quoted Commodity IT Support Services fee materially impacted, and was inextricably linked to a causal necessity to lower the prices of its MNSS base (support costs) fees. Rather, ABII's decision to reduce its MNSS base (support costs) fees was admittedly motivated by its business practices, not by materiality, causation, or nexus of the fees to one another.

b) ABII failed to explain how reducing the award fee on the Commodity IT Support Services CLIN (i.e., reducing total amount of potential fee that it could earn during performance of the task order) has a direct nexus with respect to contract risk in reducing the MNSS (support services) base fee. A reduction of [redacted]% award fee of the Commodity IT Support Services CLIN increases ABII's operational risk of earning profit on the task order. A rational nexus to reducing the Commodity IT Support Services fee would have been, for example, to increase the potential amount of base fee ABII could earn elsewhere under the task order, for instance it could have increased (not decreased) the MNSS (support services) base fee to help ensure that reducing the Commodity IT Support Services fee did not increase overall operational risk of not earning profit on the task order. DARPA alluded to this rationality in the response reproduced in paragraph 3 above by stating, "[T]he government confirms that an **increase** [emphasis added] in proposed (MNSS) base fee has a clear nexus to removing award fee from the commodity CLINs with respect to overall operational risk and would therefore be a permitted change to the quote". But there was no indication by DARPA that a **decrease** in the MNSS (support services) base fee has a clear nexus to removing award fee from the commodity CLINs with respect to overall operational risk and would therefore be a permitted change to the quote. Furthermore, ABII did not provide any explanation as to how a reduction in the MNSS (support services) base fee would mitigate operational risk or burden due to the decrease in Commodity IT Support Services award fee.

c) ABII's final quote revision did not provide sufficient evidence that ABII's revision (decrease) of its MNSS base fees in response to the Exchange Notice was inextricably linked to, caused by or had a clear nexus to its revision to Commodity IT Support Services fee. For example, ABII's Final Quote Revision Volume IV-Price/Cost does not describe the rationale for, or document, its asserted standard business practice of having same profit/fee across CLINs, including not in the following sections of its final price/cost quote: 1.4 Balanced Pricing, 1.5.1 Accounting System, 1.7.1 Proposed Base Fees, and 1.7.2 Award Fee. Moreover, within Section 1.7.2, ABII admitted that award fee is not guaranteed: "Agile-Bot II understands that award fee pools is [*sic*] not guaranteed and is an incentive to exceed requirements and award fee criteria." ABII Final Quote Revision Volume IV, p. 14. However, ABII failed to explain how its program manager will not be more focused on the MNSS (support service) effort, since [redacted]% of the total [redacted]% available fee is not guaranteed and is only earned as an incentive for exceeding requirements. In other words, I do not agree with ABII's assertion that a quoted [redacted]% award fee and [redacted]% base fee is a balanced fee approach, particularly where the Commodity IT Support Services CLIN includes a guaranteed [redacted]% base fee. In my contracting officer experience, I have found that contractor program

managers are significantly incentivized by award fees and that they put additional effort into earning award fee for their company. In my business judgment, I believe that such incentivization will be particularly significant under this task order, where only [redacted]% fee is guaranteed for the MNSS (support services) effort (i.e., CLIN 0001 in the base period) and anticipate this arrangement would have the exact affect ABII is apparently trying to avoid by incentivizing their program manager to focus on earning the 3% non-guaranteed award fee.

d) It would require DARPA to engage in unequal treatment of the Quoters if it allowed ABII to not follow the Exchange Notice instructions by making non-compliant changes to its price quote whereas the other Quoters followed the Exchange Notice instructions and did not make non-compliant changes to their price quotes. I determined it would be unfair to other Quoters, and detrimental to the integrity of the procurement system, if the price/cost team determined ABII's non-compliant revisions to its price quote were compliant (e.g., within the scope of the Exchange Notice) and evaluated it as part of determining ABII's revised quoted price.

In view of the considerations above, I determine that ABII's revision of its MNSS (support services) fee in its final quote revision — impermissibly reducing base fee from [redacted]% to [redacted]% — are non-compliant with DARPA's Exchange Notice instructions and, therefore, will not be evaluated.

7. I have directed the price/cost team to conduct two evaluations. First, to provide the Decision Authority with information to conduct his own independent review of ABII's final quote revision, I directed the price/cost team to evaluate ABII's price/cost quote as submitted, and to evaluate ABII's non-compliant revision to its MNSS (support services) fee. Second, I directed the price/cost team to separately evaluate ABII's price/cost quote given my decision to reject the non-compliant portion of the final quote revision. I further directed the price/cost team to disregard ABII's non-compliant reduction in the MNSS (support services) base fee from [redacted]% to [redacted]% and to evaluate ABII's final price MNSS (support services) base fee at [redacted]% as originally quoted by ABII.

(emphasis in original) (first alteration added).

On February 25, 2021, the Technical Evaluation Board issued a Technical Evaluation Board Consensus Report for all three offerors, and the same day, February 25, 2021, the Price/Cost Evaluation Board issued a Price/Cost Evaluation. Regarding the Price Fair & Reasonableness Analysis, the February 25, 2021 Price/Cost Evaluation stated:

The Price/Cost Evaluation Board (PCEB) used two price analysis techniques from FAR 15.404-1 and in accordance with DoD Class Deviation 2014-O0011 to evaluate the price/cost quotations. Normally, adequate price competition establishes a fair and reasonable price (FAR 15.403-1(c)(1)(i)). Thus, first, because of the competitive nature of this acquisition, which received three competitive responsive quotations, the PCEB found that all Quoters' prices were presumptively fair and reasonable. Second, to provide additional assurance that the proposed prices were fair and reasonable, the PCEB further analyzed the total evaluated price of each quotation by comparing proposed prices to each other and to historical prices paid for the same items as reflected in the Independent Government Cost Estimate (IGCE).

The February 25, 2021 Price/Cost Evaluation determined:

The PCEB considers the Quoters' total evaluated prices to be fair and reasonable as they are each not higher than the IGCE. Additionally, the IGCE is further confirmed to be an acceptable baseline as it is reasonably close (i.e., less than 20% higher) than the average of the three Quoters' total evaluated prices. FAR price analysis guidance was used to provide additional analysis for reasonableness. FAR 15.403-1(c)(1)(i) allows the following elements to establish a price is based on adequate price competition, and thus the PCEB was able to corroborate the method used with the following price reasonableness guidance from the cited FAR regulations:

a) Two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement.
* In response to this RFQ, three responsible Quoters, competing independently, submitted priced offers that satisfy the Government's expressed requirement.

b) Award will be made to the offeror whose proposal represents the best value where price is a substantial factor in source selection.
* Per the RFQ, award will be made to the Quoter whose quotation represents the best value, and although price is listed as significantly less important than the other six factors, it is still a substantial factor. In addition, it is noted the importance of price will increase as the other six non-price factors become closer in merit.

c) There is no finding that the price of the otherwise successful offeror is unreasonable.
* There is no finding, as documented below, that the price is unreasonable for any of the Quoters. Therefore, all technically acceptable proposals received are considered fair and reasonable based on adequate price competition.

Below is the reasonableness evaluation of quoted maximum on-site and off-site Labor Hour (LH) rates for all personnel descriptions:

ABII's quoted maximum (surge) on-site LH rates are reasonable as they were proposed in response to a competitive acquisition that the PCEB determined met FAR 15.403-1(c)(1)(i) requirements for establishing adequate price competition. Further, the proposed maximum (surge) on-site LH rates are approximately [redacted]% higher than the highest acceptable fully loaded labor rate for each labor category included in the fixed price labor totals. Their maximum (surge) off-site LH rates are also reasonable as they are [redacted]% higher than the highest acceptable fully loaded maximum (surge) on-site labor rate for each labor category included in the fixed price labor totals to also consider their [redacted]% contractor site overhead rate.

SecuriGence's quoted maximum (surge) on-site and off-site LH rates are reasonable as they were proposed in response to a competitive acquisition that the PCEB determined met FAR 15.403-1(c)(1)(i) requirements for establishing adequate price competition and they are [redacted] the acceptable fully loaded labor rates included in the fixed price labor totals.

[redacted] quoted maximum (surge) on-site and off-site LH rates are reasonable as they were proposed in response to a competitive acquisition that the PCEB determined met FAR 15.403-1(c)(1)(i) requirements for establishing adequate price competition and they are [redacted] the acceptable fully burdened labor rates included in the fixed price labor totals.

All Quoters complied with the RFQ and Government-provided spreadsheet in proposing 3% award fee on the MNSS fixed price.

Regarding the cost realism analysis, the February 25, 2021 Price/Cost Evaluation determined:

The cost realism analyses and performance risk ratings are documented for each Quoter are as follows and discussed below:

Table 3. Performance Risk Ratings for Phase II Price Quotes

| Quoter | Performance Risk Rating |
|--------|------------------------|
| Agile-Bot II | Low Risk |
| SecuriGence | Low Risk |
| [redacted] | Medium Risk |

For ABII, the February 25, 2021 Price/Cost Evaluation summarized:

ABII's price/cost quotation is determined to [sic] realistic for the work to be performed, reflects a clear understanding of the requirements, and is consistent with the unique methods of performance described in the Quoter's technical quotation. ABII's focus on supporting engineering and operations capabilities, as described in the Technical Approach, is demonstrated by the Engineering and Operations staff levels meeting and exceeding the proposed levels in the IGCE. Based upon the PCEB's thorough review of documentation provided by ABII, considering their proposed labor hours, direct labor rates, fringe, overhead, G&A, SM&H, escalation, proposed base fee/profit, and other price/cost considerations, there is negligible potential to cause degradation of performance or issues with retention and recruitment of personnel, so ABII receives a "Low Risk" Performance Risk Rating.

For SecuriGence, the February 25, 2021 Price/Cost Evaluation summarized,

based on the preceding analysis, the SecuriGence price/cost quotation is determined to be realistic for the work to be performed, reflects a clear understanding of the requirements, and is consistent with the unique methods of performance described in the Quoter's technical quotation. SecuriGence's strengths in [redacted] of the Technical Approach with regard to the assessment of the [redacted] and correlation of events, is demonstrated by the focus on [redacted] personnel. Based upon the PCEB's thorough review of documentation provided by SecuriGence, considering their proposed labor hours, direct labor rates, fringe, overhead, G&A, SM&H, escalation, proposed base fee/profit, and other price/cost considerations, there is negligible potential to cause degradation of performance or issues with retention and recruitment of personnel, so SecuriGence receives a "Low Risk" Performance Risk Rating.

For [redacted], the February 25, 2021 Price/Cost Evaluation determined that

based on the preceding analysis, [redacted] price/cost quotation is determined to have some realism for the work to be performed, reflects a clear understanding of the requirements, and is consistent with the unique methods of performance described in the Quoter's technical quotation. Based upon the PCEB's thorough review of documentation provided by [redacted], considering their proposed labor hours, direct labor rates, fringe, overhead, G&A, SM&H, escalation, proposed base fee/profit, and other price/cost considerations, there is some potential to cause degradation of performance or issues with retention and recruitment of personnel, so [redacted] receives a "Medium Risk" Performance Risk Rating.

On March 1, 2021, DARPA's source selection authority issued a Best Value Determination and Task Order Award Decision, and explained that

[i]n determining the best value, in accordance with FAR 8.4, I utilized a trade-off process between the evaluation factors in the order of relative importance specified in the RFQ. My task order decision considers recommendations from the Technical Evaluation Board (TEB) and Price/Cost Evaluation Board (PCEB), but represents my own independent judgment of each quote. I agree with the TEB and PCEB analysis and ratings and will not re-state their findings; rather, in this memorandum I will generally focus on the distinguishing features within each quote that weighed most heavily on my best value determination and task award decision.

The Best Value Determination and Task Order Award Decision also included the following chart:

Table 1. Summary of Adjectival Ratings for Factors 1-6 and Price/Cost Findings for Factor 7.

| Evaluation Factor | Factor Name | SecuriGence | ABII | [redacted] |
|---|---|---|---|---|
| 1 | Essential Capabilities Experience | Substantial Confidence | Substantial Confidence | Substantial Confidence |
| 2 | Technical Approach | High Confidence | High Confidence | High Confidence |
| 3 | Management Approach | High Confidence | High Confidence | Medium Confidence |
| 4 | Key Personnel | High Confidence | High Confidence | Low Confidence |
| 5 | Past Performance | Substantial Confidence | Substantial Confidence | Substantial Confidence |
| 6 | Supply Chain Risk Mitigation Plan | High Confidence | High Confidence | High Confidence |
| 7 | Price/Cost* (Performance Risk Rating) | $781,997,009 (Low Risk) | $819,569,555** (Low Risk) | $[redacted] (Medium Risk) |

* Prices rounded to the nearest dollar

** ABII's total price with non-complaint quoted revisions to its MNSS base fees was $[redacted]

The source selection authority also explained:

As summarized in my discussion below, I did not merely rely on the adjectival ratings and price/cost findings in Table 1 above; rather, I used the ratings and findings as guides to help me make a rational and reasonable independent decision of which Quoter offered the best value to DARPA. As further summarized in my discussion below, I determined that the first and

13

second ranked Quoters-SecuriGence and ABII-were essentially tied in merit for Evaluation Factors 1-6 and, therefore, in accordance with the RFQ, I increased the relative importance of Factor 7 (Price/Cost) in my tradeoff analysis and best value determination for these two Quoters. Further, I determined that the first and third ranked Quoters (SecuriGence and [redacted]), were not close in merit for Evaluation Factors 1-6 (I found SecuriGence much higher than [redacted] in technical merit) and therefore, in accordance with the RFQ, I considered Factor 7 as the least important factor in my tradeoff analysis and best value determination for these two Quoters.

I also carefully considered the price premium for ABII's quote; specifically, whether it offered additional technical value to DARPA that would justify its price premium over SecuriGence's quote. As discussed below, I did not find that ABII's quote offered DARPA additional technical value that justified its price premium and selecting it for the task order award over SecuriGence. Although I did not find [redacted] quote to be close in technical value to SecuriGence's quote, out of prudence, and to be mindful of my duty as a steward of taxpayers' dollars, I also carefully considered the price premium of SecuriGence's price quote over [redacted] quote. I wanted to make sure that SecuriGence's quote was worth its additional price to DARPA notwithstanding that it was much higher rated than [redacted] on Evaluation Factors 1-6. As discussed below, I found that SecuriGence's quote offered DARPA additional technical value that justified its price premium and selecting it for the task order award over [redacted] quote.[3]

Regarding Factor 2, the source selection authority concluded:

For **Factor 2 (Technical Approach),** I determine ABII, SecuriGence, and [redacted] each receive a High Confidence rating. For Factor 2, I have high confidence that all three Quoters understand the requirement, propose a sound approach, and will be successful in performing the task order.

For Factor 2, the distinguishing features of ABII's approach were an excellent process for the management of the DARPA Network Operations Support Center (NOSC), their experience with implementing product teams, and their focus on speeding up the deployment of classified sites with the proposed Commercial Solutions for Classified for improved Multi-Level System functionality shows a clear understanding of the DARPA requirements and a focus on supporting the Tech Offices in conducting their

---

[3] As the source selection authority found SecuriGence's proposal and ABII's proposal to be significantly higher rated for Factors 1-6 than [redacted] proposal, and as ABII does not raise any challenges to DARPA's evaluation of [redacted], this Opinion does not address all of the observations the source selection authority made regarding [redacted] proposal.

missions. Furthermore, ABII's approach to problem management is robust, using personnel and unique automated tools to drive efficiencies that will minimize outages and increase network uptime. Within Cloud, ABII distinguished itself by having a proven methodology and unique understanding of building a virtual private cloud for DARPA's unclassified network, which should allow for a seamless and quick transition for DARPA's classified network operations. These strengths, along with others and no significant weaknesses or deficiencies noted, led me to assign ABII a High Confidence rating for Factor 2.

For Factor 2, SecuriGence had numerous strengths with one minor weakness. SecuriGence's distinguishing features included an excellent [redacted]. In particular, [redacted]. Furthermore, SecuriGence's practice of [redacted] and will allow [redacted]. Additionally, SecuriGence's approach to the NOSC had several strengths, most notably, their focus on security [redacted] and their staffing approach that allows for a [redacted], exceeding expectations, but very beneficial to DARPA that has [redacted]. For Factor 2, SecuriGence had one minor weakness, but it does not weigh heavily against it my award decision. There is some risk to the schedule that SecuriGence has proposed for off-site secure storage. SecuriGence proposes renovations to their quoted contractor-provided facility for storage requirements will be completed prior to the start of contract. However, there are not many details to understand how SecuriGence will meet this timeline or how other mentioned rental options completely mitigate the risk. I find this risk is mitigated, for the following reasons. SecuriGence has [redacted] sq. ft. available [redacted] and DARPA has the ability to cover the remainder of requirement while any final renovations are made or other space is rented. In addition, considerable time has passed since SecuriGence's initial quote submission, their final quote submission, and more time will pass by before the period of performance starts reducing the risk their required improvements and accreditation will not occur on-time as quoted. Other potential local options were also mentioned by SecuriGence, and although there were not detailed enough to completely eliminate the risk, based on Government knowledge, and in my business judgement, it is likely SecuriGence will be able to rent additional local space, as quoted, in time to meet PWS requirements should their other proposed facility not be ready. I also noted that SecuriGence is [redacted]. These strengths, along with others, one minor weakness (which I believe is sufficiently mitigated), and no deficiencies noted, led me to assign SecuriGence a High Confidence rating for Factor 2.

(capitalization in original).

For Factor 3, the source selection authority explained:

For **Factor 3 (Management Approach),** ABII and SecuriGence each receive a High Confidence rating. For Factor 3, [redacted] receives a Medium Confidence rating. For Factor 3, I have high confidence that ABII and SecuriGence understand the requirement, propose a sound approach, and will be successful in performing the task order. For Factor 3, I have some confidence that [redacted] understands the requirement, proposes a sound approach, and will be successful in performing the task order.

For Factor 3, ABII's management approach strategies, taken in aggregate, form a comprehensive portfolio of recruitment, training, incentives, and compensation that should result in hiring and retaining a high-quality MNSS staff. Likewise, for Factor 3, ABII has a robust plan for quality control to include well-defined quality management and service level objective responsibilities and the ability to reach-back for corporate support. Additionally, for Factor 3, ABII has a sound product team structure that also adds value by providing [redacted] that will help ensure DARPA is able to rapidly evolve to emerging DoD mandates.

For Factor 3, SecuriGence's proposed removal of [redacted] aligns the staff to the mission and [redacted]. In addition, SecuriGence's approach provides value with [redacted] and an [redacted] to reduce the burden for the [redacted] while also providing ideas [redacted]. Overall, for Factor 3, I believe that SecuriGence's approach to recruitment, training, incentives, and compensation should result in hiring and retaining a high-quality MNSS staff.

The source selection authority continued: "In summary, for Factor 3, my confidence is significantly higher in ABII and SecuriGence than in [redacted]. I have equal confidence in ABII and SecuriGence for Factor 3. Therefore, I assigned ABII and SecuriGence High Confidence ratings for Factor 3, and I assigned [redacted] a Medium Confidence rating for Factor 3."

For Factor 7, the source selection authority concluded:

For **Factor 7 (Price/Cost),** ABII quoted a Total Evaluated Price of $819,569,555 and receives a Low Risk rating; SecuriGence quoted a Total Evaluated Price of $781,997,009 and receives a Low Risk rating; and [redacted] quoted a Total Evaluated Price of $[redacted] and receives a Medium Risk rating.

For ABII for Factor 7, I concur with the Contracting Officer's Memorandum for Record (MFR), dated February 10, 2021, that documented non-compliant quote revisions that ABII made to their price quote during

Exchanges. Specifically, I concur with the Contracting Officer that ABII's reduction of its quoted MNSS base (support costs) fees from [redacted]% to [redacted]% is non-compliant because reducing these fees did not have a clear nexus to and was not materially impacted by the relevant Exchange Notice to revise (reduce) its Commodity IT services fee. These non-compliant revisions resulted in ABII's quoted price being $[redacted] lower than ABII's total evaluated price cited above ($819,569,555), or $[redacted]. I carefully reviewed ABII's rationale for making these non-compliant revisions, specifically that they were required based on their internal standard business practices to provide balanced pricing and fee approaches. ABII's business rationale offered for making the revisions does not adequately explain and fails to establish how ABII's revision to the Commodity IT Services fee in response to the Exchange Notice materially impacted and had a clear nexus to requiring ABII to also reduce its MNSS base fees. I found ABII's rationale failed to explain how revisions to the Commodity IT services fee was inextricably linked to requiring ABII to reduce the MNSS base fees. I believe that ABII's business rationale for making the non-compliant quote revisions was not sufficient to establish the causal nexus (not business nexus, as ABII would apparently have it) required by the Exchange Notice instructions. Consequently, I concur with the Contracting Officer's MFR, and I determined that ABII's revisions to its MNSS base fees were non-compliant with the Exchange Notice instructions. The instructions specifically notified all Quoters that any price/cost changes must fully explain how such changes have a clear nexus to and are materially impacted by the Exchange Notice. Further, the instructions stated, that any final quote revisions that change aspects of the quote outside of the scope of the Exchange Notice will be deemed non-compliant and not evaluated by DARPA. Thus, I rejected ABI''s revisions to its MNSS base fees- totaling $[redacted]-and these revisions are not included in ABII's total evaluated price above. I also found, from an equal treatment perspective, that SecuriGence and [redacted] followed the Exchange Notice instructions and did not submit non-compliant quote revisions as part of their final quote revisions. I believe it would be unfair to SecuriGence and [redacted] if I accepted ABII's non-compliant price quote revisions discussed above. I would have to treat ABII unequally, and more preferentially, than SecuriGence and [redacted] if I decided to accept ABII's non-compliant final quote revisions. I consider this matter further as part of my trade-off summary and best value determination below.

For Factor 7, I find ABII's quote, as evaluated and not considering the non-compliant price revisions discussed above, to be reasonable and realistic. I determine ABII's quote to contain negligible potential to cause degradation of performance or issues with retention and recruitment of personnel. ·

For Factor 7, I find SecuriGence's quote to be reasonable and realistic. I determine SecuriGence's quote to contain negligible potential to cause

degradation of performance or issues with retention and recruitment of personnel.

(capitalization and emphasis in original). The source selection authority continued: "Therefore, for Factor 7, I assigned ABII's and SecuriGence's price/cost quote each a Low Risk rating."

The source selection authority then moved to the trade-off analysis and for Factor 7 explained: "For **Factor 7 (Price/Cost),** I concur with the Price/Cost Evaluation Board's assessment that all three Quoters' quotes are fair and reasonable. Concerning realism, I find little to no risk with ABII's and SecuriGence's quotes. I find that [redacted], however, has some risk associated with realism." (emphasis in original). The source selection authority continued:

> For Factor 7, from a trade-off perspective, I find ABII and SecuriGence to be essentially equal in realism risk, and both are higher priced than [redacted]. As between ABII and SecuriGence, however, my consideration of Factor 7 additionally included an increased relative importance of Factor 7 due to the closeness in the merit of ABII's and SecuriGence's quotes for Factors 1-6. I also considered the price premiums associated with ABII's quote compared to SecuriGence's quote; and the price premium of SecuriGence's quote compared to [redacted] quote. These considerations are further discussed below.

> For Factors 1-6, overall, I found the technical quotes of ABII and SecuriGence to be very close in merit and essentially tied for these Factors. Therefore, in accordance with the RFQ, I increased the relative importance of Factor 7 (Price/Cost) in my trade-off analysis and comparison of the quotes of ABII and SecuriGence. On the other hand, for Factors 1-6, overall, I found the technical quote of [redacted] to be significantly lower in value to DARPA than the quote for SecuriGence (and ABII). I did not increase the relative importance of Factor 7 (Price/Cost) in my trade-off analysis and comparison of the quotes of SecuriGence (and ABII) and [redacted]. I did, however, take note that [redacted] total evaluated price is lower than the total evaluated price for ABII and for SecuriGence. The following table restates the total evaluated prices for ABII, SecuriGence, and [redacted]:

Table 4. Summary of Total Evaluated Prices for Phase II Quoters.

| Phase II Quoter | Total Evaluated Price* |
|---|---|
| ABII | $819,569,555** |
| SecuriGence | $781 997,009 |
| [redacted] | $[redacted] |

\* Prices rounded to the nearest dollar.
\*\* ABII's total price with non-compliant quoted revisions to its MNSS base fees was $[redacted].

The source selection authority explained:

As documented in Table 4, I found that ABII's total evaluated price is higher than either SecuriGence's or [redacted] total evaluated price. Relevantly, ABII's total evaluated price is approximately $37.6M higher than SecuriGence, which is approximately $4M per year higher over the potential 9.5-year period of performance (PoP) of the task order. Even if I accepted ABII's non-compliant quote revision, which I do not, ABII's total quoted price is still up to $[redacted] higher than SecuriGence's total evaluated price, or about $[redacted] over the potential 9.5-year PoP of the task order. Thus, per the RFQ's evaluation rating scheme, and as discussed below, in view of my decision to increase the importance of price/cost in my award decision, I carefully considered whether the $37.6M price premium of ABII's quote was within the price premium in terms of additional technical value to DARPA compared to the equally technically rated but significantly lower-priced quote of SecuriGence.

Also, as documented in Table 4, I found that SecuriGence's total evaluated price is approximately $[redacted] higher than the total evaluated price of [redacted]. As discussed above, for Factors 1-6, I found SecuriGence's quote to be of significantly higher value to DARPA than [redacted] quote. Therefore, per the RFQ, I did not increase the relative importance of Factor 7 (Price/Cost) in my trade-off analysis between these two Quoters, e.g., per the RFQ, Factor 7 remained as the least important factor. Nevertheless, out of prudence, and as a steward of taxpayers' dollars, I considered whether the $[redacted] cost premium of SecuriGence's higher rated technical quote offered DARPA additional technical value over [redacted] lower-rated technical quote.

Considering SecuriGence's and ABII's price quotes from a trade-off perspective, and considering my decision to increase the relative importance of Factor 7 for these two quotes, and further considering that I find the technical quotes of these two Quoters to be essentially tied, I determined that ABII's higher-priced quote is not worth its higher price to DARPA compared to SecuriGence's equally highly rated but significantly lower-priced quote. As summarized by my adjectival ratings in Table 1 and trade-off summary for Factors 1-6 above, I found ABII and SecuriGence to be equally highly rated and essentially tied for these Evaluation Factors. I carefully considered any potential technical differentiators between the two quotes. For instance, for Factor 2 (Technical Approach) I considered SecuriGence's weakness for its off-site secure space approach. Although I believe this weakness to be sufficiently mitigated, I nevertheless weighed it from a price premium perspective ( e.g., Was it worth for DARPA to pay up

to $37.6M more and award ABII and avoid this weakness in SecuriGence's quote? My answer: No.). Under Factor 5 (Past Performance), I also considered that SecuriGence had five (5) past performance submissions versus the six (6) past performance submissions for ABII. Although I did not find the fact that SecuriGence five past performance submissions to be a weakness, I weighed it from a price premium perspective to ensure that I considered any potentially distinguishing technical feature between ABII's and SecuriGence's technical quotes (e.g., Was it worth it for DARPA to pay up to $37.6M more and award to ABII because it provided one more past performance submission than SecuriGence? My answer: No). Based on my review, I did not identify any technical feature or a combination of technical features of ABII's quote that, in my business judgement, would justify DARPA spending up to $37.6M, or about $4M per year more on ABII's quote compared to SecuriGence's quote which I believe offers DARPA essentially equal value at a significantly less price. Even if I would have accepted ABII's non-compliant quote revisions, which I do not, its price premium compared to SecuriGence's quote is still $[redacted], or about $[redacted] per year. In comparing the quotes of ABII and SecuriGence from the perspective of its non-compliant price quote, I still found little, if anything, in ABII's technical quote that would justify DARPA spending up to $[redacted], or $[redacted] per year more than it would for SecuriGence's [sic] quote which offers equal value at a significantly lower price. Therefore, I concluded that ABII's quote is not worth its $37.6M price premium, or even a $[redacted] price premium, over SecuriGence's equally highly rated but significantly lower-priced quote. My conclusion is reinforced by my decision to increase the relative importance of Factor 7 (Price/Cost) based on my finding that the quotes for ABII and SecuriGence are essentially tied for Evaluation Factors 1-6. In my judgment, from a price premium and price/cost trade-off perspective. SecuriGence's quote offers greater value to DARPA than ABII's quote.

Considering SecuriGence's and [redacted] price quotes, and in view of my decision not to increase the relative importance of Factor 7 for these two quotes, and fu1ther considering that I find SecuriGence's technical quote under Factors 1-6 to be significantly higher rated than [redacted] technical quote, I nevertheless still considered whether SecuriGence's quote offers DARPA additional technical value that justifies its $25.4M price premium, or about $[redacted] per year. I found that SecuriGence's quote offers DARPA additional technical value that justifies its price premium compared to [redacted] quote.

The Best Value Determination and Task Order Award Decision concluded:

After independently considering the evaluation ratings and the particular merits and risks associated with each final quote revision, I determine that SecuriGence's quote provides the best value to the Government. My best

value determination takes into consideration the RFQ's evaluation factors in descending order of importance, increasing the relative importance of Factor 7 for ABII and SecuriGence's quotes due to their closeness in technical merit, and considering all of the aforementioned distinguishing features of the Quotes.

ABII and SecuriGence had the same adjectival ratings for all factors and included very similar distinguishing factors that did not significantly influence my decision for either Quoter. As I have documented in my discussion above, I found ABII and SecuriGence to be essentially tied for Evaluation Factors 1-6. Therefore, the respective strengths and risks resulted in ABII's and SecuriGence's quotes being extremely close in technical merit in my trade-off analysis and, as discussed above, led me the relative importance of price/cost Factor 7 in my award decision. As I also discuss above, I did not find that the up to $37,572,546, or about $4M per year, price premium of ABII's quote was worth its premium over SecuriGence's quote given that SecuriGence's quote offers DARPA essentially the same technical value at a much lower price. I have equal confidence that ABII and SecuriGence understand the requirement, proposed a sound approach, and could be successful in performing the task order. I selected SecuriGence over ABII because I found no persuasive additional technical advantages in ABII's quote that, in my judgment, were worth its much higher price compared to SecuriGence's quote. Thus, I find that SecuriGence's quote offers better value to DARPA than ABII's quote.

I agree with the Contracting Officer's decision to reject the non-compliant portion of ABII's final quote that decreased the base fee on the Multi-Network Support Services. As stated by the Contracting Officer, I agree that it would be unfair to the other Quoters, and in my opinion, detrimental to the integrity of the procurement system, if the price/cost team determined ABII's non-compliant revisions to its price quote were compliant (e.g., within the scope of the Exchange Notice) and evaluated it as part of determining ABII's revised quoted price. However, even if the quote revision of reducing base fee had been compliant with the Exchange Notice, which it was not, it still would not have changed my best value decision. More specifically, even with a price premium of up to $[redacted], or about $[redacted] per year, ABII's quote would still not be worth awarding over SecuriGence's quote which offers essentially equal technical value at a much lower price. Thus, even if I would have accepted ABII's non-compliant price revisions, which I do not, I would still find that SecuriGence's quote offers better value to DARPA than ABII's quote.

I found that SecuriGence's quote to be much higher rated in technical merit than [redacted] quote. So, per the RFQ, I did not increase the relative importance of price/cost Factor 7 in my comparison of SecuriGence's and [redacted] quotes. For SecuriGence's versus [redacted] quotes, Factor 7

remained as the least important Evaluation Factor. But out of prudence, and mindful of my duty as a steward of taxpayer's funding, I nevertheless considered the price premium of SecuriGence's quote to confirm that it was, in my judgement, worth its extra price to DARPA. As documented above, I found SecuriGence's higher-rated quote to be worth its $[redacted], or about $[redacted] per year, price premium compared to [redacted] lower rated but lower priced quote. My finding was based on my consideration of [redacted] lower overall ratings for several of the Evaluation Factors, including for Factor 3 where there were significant weaknesses related to [redacted] within its staffing plan; for Factor 4 where minimum requirements for the [redacted] were not met, for Factor 5 where there was [redacted] for a Very Relevant contract; and for Factor 7 whether there was some realism risk. I am much more confident in SecuriGence than [redacted] that SecuriGence understands the requirement, proposes a sound approach, and will be successful in performing the task order. I determined that it is more valuable to DARPA to pay the price premium for a Quoter (SecuriGence) that I am fully confident is able to successfully perform all MNSS requirements than to award to a Quoter ([redacted]) that I am not confident can successfully perform all MNSS requirements, particularly given how critical MNSS services are to carrying out DARPA's mission to maintain technological superiority over our adversaries. I have identified and documented technical features of SecuriGence's quote that support my price premium determination. Thus, I find that SecuriGence's quote offers better value to DARPA than [redacted] quote.

Therefore, for the three quotes evaluated under the Phase II of the RFQ:

1. I rank SecuriGence as first in line for the task order award.
2. I rank ABII as second in line for the task order award.
3. I rank [redacted] as third in line for the task order award.

**Award Decision**
I have directed the Contracting Officer to award the task order to SecuriGence in the amount of $734,813,243. This dollar amount is lower than the above total evaluated price ($781,997,009) because it does not include the FAR 52.217-8 six-month extension in the amount of $47,183,766.

(emphasis in original).

The following day, March 2, 2021, ABII received notice that DARPA had again awarded the task order to SecuriGence. Subsequently, on March 11, 2021, ABII filed another protest at the GAO. ABII argued that "DARPA's evaluation of both ABII and SecuriGence's proposals was riddled with numerous material flaws and conducted in a manner contrary to the requirements of the RFQ and relevant procurement law principles. These errors, taken individually and collectively, render DARPA ITD's best value

determination and resultant award decision unreasonable." On June 16, 2021, the GAO denied the protest in full.

On June 30, 2021, protestor filed a bid protest complaint in this court. Subsequently, protestor filed an amended complaint on July 7, 2021. Protestor's amended complaint had 7 counts.[4] Count 1 claims that DARPA "arbitrarily and capriciously failed to adhere to the terms of the RFQ in its price realism evaluation," Count 2 alleges that DARPA "arbitrarily and capriciously utilized a flawed price realism methodology that relied on an overly narrow sample." Count 3 claims that DARPA "arbitrarily and capriciously failed to reject SecuriGence's quotation as unacceptable under Factor 2 for its failure to comply with a material solicitation requirement." Specifically, the amended complaint alleges that "SecuriGence's quotation did not adhere to the RFQ's material requirement to provide approximately 2,000 square feet of equipment storage space at a Top Secret Sensitive Compartmented Information Facility ('SCIF') with a current Top Secret Facility Security Clearance ('FCL') within the National Capitol Region." The amended complaint argues that "[b]y its own admission, SecuriGence could not provide ~2,000 square feet of storage at an accredited SCIF location at the time of quotation submission," but "rather than disqualifying SecuriGence from the competition because of its material noncompliance with the requirement for a Top Secret SCIF, the Agency arbitrarily and capriciously assessed SecuriGence a 'minor' weakness, while acknowledging that SecuriGence's proposed contractor furnished space could not maintain its SCIF accreditation." Count 4 alleges that "DARPA treated ABII and SecuriGence disparately in its evaluation of Factor 3 (Management approach) quotations." Count 5 alleges that DARPA "arbitrarily and capriciously determined that ABII's price revisions were not compliant with en [exchange notice] instructions and improperly ignored the revisions in its evaluation of ABII's price." Count 6 alleges that "DARPA conducted an arbitrary and capricious evaluation of SecuriGence's price under Factor 7." The amended complaint contends that DARPA conducted an "arbitrary and capricious price/cost realism evaluation of SecuriGence's price by failing to consider the risk inherent in SecuriGence's unrealistically low price. Because of this fundamental evaluation flaw, the Agency assessed SecuriGence's price a Low Risk rating rather than the Medium, if not High Risk assessment that its quotation warranted." Finally, Count 7 alleges "DARPA conducted an arbitrary and capricious best value tradeoff resulting in a flawed best value determination."

On July 2, 2021, the court held an initial hearing with the parties, and set an aggressive schedule for briefing cross-motions for the judgment on the amended Administrative Record, per the agency's requirement a decision be issued by August 31, 2021. After all the submissions were reviewed, and cognizant of the request that a decision be made by August 31, 2021, on August 30, 2021, as noted above, the court

---

[4] Protestor's June 30, 2021 complaint originally included two additional counts, a count alleging that "DARPA treated ABII and SecuriGence disparately in its evaluation of Factor 2 (Technical approach) quotations," and a count alleging that DARPA "arbitrarily and capriciously evaluated SecuriGence's past performance (Factor 5) quotation." Neither count was included in the amended complaint filed on July 7, 2021.

issued an oral decision, "effectively immediately, to the parties and provided an explanation of its decision which granted defendant's and intervenor's cross-motions for judgment on the amended Administrative Record and denied protestor's motions for judgment on the amended Administrative Record. As noted above, this decision incorporates and memorializes the oral decision.

## D I S C U S S I O N

As noted above, the parties have filed cross-motions for judgment on the amended Administrative Record. Rule 52.1(c)(1) (2021) of the Rules of the United States Court of Federal Claims (RCFC) governs motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) see also Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. 681, 691 (2020) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005)); see also AAR Manufacturing, Inc. v. United States, 149 Fed. Cl. 514, 522 (2020); Glocoms, Inc. v. United States, 149 Fed. Cl. 725, 731 (2020); Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 223 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1353-54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing PAI Corp. v. United

States, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332; Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004). In Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345 (Fed. Cir. 2004), the Federal Circuit explained that "[u]nder the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Id. at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); see also Harmonia Holdings Grp., LLC v. United States, 999 F.3d 1397, 1403 (Fed. Cir. 2021); Palantir USG, Inc. v. United States, 904 F.3d 980, 990 (Fed. Cir. 2018); AgustaWestland North Am., Inc. v. United States, 880 F.3d 1326, 1332 (Fed. Cir. 2018); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003).

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350-51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)))), reh'g and reh'g en banc denied (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2018);[5] see also Veterans

---

[5] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> > (1) compel agency action unlawfully withheld or unreasonably delayed; and

Contracting Grp., Inc. v. United States, 920 F.3d 801, 806 (Fed. Cir. 2019) ("In a bid protest, we follow Administrative Procedure Act § 706 and set aside agency action 'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252 (Fed. Cir. 2015)); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not

---

      (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

        (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

        (B) contrary to constitutional right, power, privilege, or immunity;

        (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

        (D) without observance of procedure required by law;

        (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

        (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); <u>Synergy Sols., Inc. v. United States</u>, 133 Fed. Cl. 716, 734 (2017) (citing <u>Banknote Corp. of Am. v. United States</u>, 365 F.3d at 1350); <u>Eco Tour Adventures, Inc. v. United States</u>, 114 Fed. Cl. at 22; <u>Contracting, Consulting, Eng'g LLC v. United States</u>, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" <u>Turner Constr. Co. v. United States</u>, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting <u>PAI Corp. v. United States</u>, 614 F.3d at 1351), <u>reh'g en banc denied</u> (Fed. Cir. 2011); <u>see also Tinton Falls Lodging Realty, LLC v. United States</u>, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (citing <u>Savantage Fin. Servs., Inc. v. United States</u>, 595 F.3d at 1285-86)); <u>Glenn Def. Marine (ASIA), PTE Ltd. v. United States</u>, 720 F.3d 901, 907 (Fed. Cir.), <u>reh'g en banc denied</u> (Fed. Cir. 2013); <u>McVey Co., Inc. v. United States</u>, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); <u>PlanetSpace, Inc. v. United States</u>, 92 Fed. Cl. 520, 531-32 ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1358)), <u>subsequent determination</u>, 96 Fed. Cl. 119 (2010).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

<u>Nat'l Ass'n of Home Builders v. Defenders of Wildlife</u>, 551 U.S. 644, 658 (2007) (quoting <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983)); <u>see also F.C.C. v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 552 (2009); <u>Tinton Falls Lodging Realty, LLC v. United States</u>, 800 F.3d at 1358; <u>Ala. Aircraft Indus., Inc.-Birmingham v. United States</u>, 586 F.3d 1372, 1375 (Fed. Cir. 2009), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2010); <u>In re Sang Su Lee</u>, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); <u>Textron, Inc. v. United States</u>, 74 Fed. Cl. 277, 285-86 (2006), <u>appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc.</u>, 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." <u>Pension Benefit Guar. Corp. v. LTV Corp.</u>, 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. <u>See Motor</u>

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). "''If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'''" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (internal citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. 186, 199 (2019); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the

'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting <u>Keeton Corrs., Inc. v. United States</u>, 59 Fed. Cl. 753, 755, <u>recons. denied</u>, 60 Fed. Cl. 251 (2004); and <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d at 1381)), <u>appeal dismissed</u>, 559 F. App'x 1033 (Fed. Cir. 2014); <u>Supreme Foodservice GmbH v. United States</u>, 109 Fed. Cl. at 382; <u>Alamo Travel Grp., LP v. United States</u>, 108 Fed. Cl. 224, 231 (2012); <u>ManTech Telecomms. & Info. Sys. Corp. v. United States</u>, 49 Fed. Cl. 57, 63 (2001), <u>aff'd</u>, 30 F. App'x 995 (Fed. Cir. 2002).

According to the United States Court of Appeals for the Federal Circuit:

> Effective contracting demands broad discretion. <u>Burroughs Corp. v. United States</u>, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); <u>Sperry Flight Sys. Div. v. United States</u>, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); <u>see NKF Eng'g, Inc. v. United States</u>, 805 F.2d 372, 377 (Fed. Cir. 1986); <u>Tidewater Management Servs., Inc. v. United States</u>, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); <u>RADVA Corp. v. United States</u>, 17 Cl. Ct. 812, 819 (1989), <u>aff'd</u>, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." <u>Tidewater Management Servs.</u>, 573 F.2d at 73, 216 Ct. Cl. 69.

<u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d at 958-59; <u>see also Res-Care, Inc. v. United States</u>, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting <u>Tyler Constr. Grp. v. United States</u>, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), <u>reh'g en banc denied</u> (Fed. Cir. 2014); <u>Grumman Data Sys. Corp. v. Dalton</u>, 88 F.3d 990, 995 (Fed. Cir. 1996); <u>Geo-Med, LLC v. United States</u>, 126 Fed. Cl. 440, 449 (2016); <u>Cybertech Grp., Inc. v. United States</u>, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the United States Court of Appeals for the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." <u>CHE Consulting, Inc. v. United States</u>, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

<u>PAI Corp. v. United States</u>, 614 F.3d at 1351; <u>see also AgustaWestland N. Am., Inc. v. United States</u>, 880 F.3d at 1332 ("Where, as here, a bid protester challenges the procurement official's decision as lacking a rational basis, we must determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' recognizing that 'contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332-33 (internal quotation marks and citation omitted))); <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke [ ] "highly deferential"

rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (alteration in original) (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

"Contracting officers 'are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process,'" PAI Corp. v. United States, 614 F.3d at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332), and "[a]ccordingly, procurement decisions are subject to a 'highly deferential rational basis review.'" Id. (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

When the contracting officer's discretion grows, so does the burden on the protestor. As noted in D & S Consultants, Inc. v. United States:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. DynCorp Int'l v. United States, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion;" "best-value" awards afford the contracting officer additional discretion. Id. Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (citations omitted)). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59); see also Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958; Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 707 (2011) ("[A] plaintiff's burden 'is elevated where the solicitation contemplates award on a "best value" basis.'" (internal citations omitted)); Matt Martin Real Estate Mgmt. LLC v. United States, 96 Fed. Cl. 106, 113 (2010); Serco v. United States, 81 Fed. Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Fall

Lodging Realty, LLC v. United Sates, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995-96; Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 578 (2017); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; T Square Logistics Servs. Corp. v. United States, 134 Fed. Cl. 550, 555 (2017); FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014), appeal dismissed (Fed. Cir. 2015); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. at 496. To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); IT Enter. Sols. JV, LLC v. United States, 132 Fed. Cl. 158, 173 (2017) (citing Bannum v. United States, 404 F.3d at 1357-58). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'" (citation omitted)).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

Price Realism

Counts 1, 2, 5, and 6 in protestor's amended complaint allege flaws of DARPA's price evaluations including the price realism analysis. A price realism analysis considers whether an offeror's price is too low, such that it indicates a risk of poor performance and a lack of understanding of the solicitation requirements. See KWR Constr., Inc. v. United States, 124 Fed. Cl. 345, 356 (2015) ("Generally, a price realism analysis examines the performance risk of proposals in a fixed-price contract procurement, with particular attention to the risk of low-priced proposals. . . .") (internal citations removed). A price realism analysis differs from a price reasonableness analysis because a price reasonableness analysis considers whether an offeror's price is too high.[6] See Munilla Constr. Mgmt., LLC v. United States, 130 Fed. Cl. 635, 649 (2017) (explaining that an agency's concern in making a price reasonableness determination is whether the prices are too high, and a "determination of whether an offeror's prices are too low is made when an agency conducts a cost or price realism analysis"); see also EMTA Isaat, A.S. v. United States, 123 Fed. Cl. 330, 338 n.9 (2015) ("In general, a price reasonableness analysis has the goal of preventing the government from paying too much for contract work. A price realism analysis, on the other hand, investigates whether the contractor is proposing a price so low that performance of the contract will be threatened."). Price realism is not defined in the Federal Acquisition Regulation (FAR). See Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 541 n.36 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. at 663 n.11 (quoting Ralph C. Nash & John Cibinic, Price Realism Analysis: A Tricky Issue, 12 No. 7 Nash & Cibinic Rep. ¶ 40 (July 1988) (citing 48 C.F.R. § 15.404–1(d)(1), (3)) ("A price realism analysis 'is analysis to determine if the offeror's proposed prices are unrealistically low.'").[7] "As recently explained by a Judge of the United States Court of Federal Claims:

---

[6] FAR 15.404-1(a) requires a price reasonableness evaluation and provides that the "contracting officer is responsible for evaluating the reasonableness of the offered prices" in a negotiated procurement. 48 C.F.R. § 15.404-1(a)(1) (2019). The parties do not dispute that the agency considered price reasonableness.

[7] Unlike price realism, FAR 15.404-1(d) defines a cost realism analysis as "the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic

While "analyzing whether an offeror's fixed price is so low that it reflects a lack of understanding of solicitation requirements is the crux of a price realism evaluation," summary conclusions regarding price realism have been held to be insufficient, as have instances in which an agency did not meaningfully conduct the price realism analysis to which it had committed.

CW Gov't Travel, Inc. v. United States, No. 21-1354C, 2021 WL 3085500, at *13 (Fed. Cl. June 28, 2021) (quoting Flight Safety Servs. Corp., B–403831, 2010 CPD ¶ 294, 2010 WL 5241433, at *4 (Comp. Gen. Dec. 9, 2010)); see also Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 358 (2009).

The Federal Circuit has explained that Judges of this court should determine "whether the agency's price-realism analysis was consistent with the evaluation criteria set forth in the RFP, see Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004), not to introduce new requirements outside the scope of the RFP." See Alabama Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d at 1375–76 (emphasis in original); see also CW Gov't Travel, Inc. v. United States, 2021 WL 3085500, at *12. The Federal Circuit in Agile Defense, Inc. v. United States, also indicated, albeit with regard to cost realism:

> The regular view of the Court of Federal Claims, which we approve, is that contracting agencies enjoy wide latitude in conducting the cost realism analysis. See, e.g., Mission1st Grp., Inc. v. United States, 144 Fed. Cl. 200, 211 (2019) ("It is well established that contracting agencies have broad discretion regarding the nature and extent of a cost realism analysis, unless the agency commits itself to a particular methodology in a solicitation." (citation and internal quotation marks omitted)); Dellew Corp. v. United States, 128 Fed. Cl. 187, 194 (2016) ("The Agency has demonstrated that it considered the information available and did not make irrational assumptions or critical miscalculations. To require more would be infringing on the Agency's discretion in analyzing proposals for cost realism." (citation and internal quotation marks omitted)); United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 329 (2003) (emphasizing that the procuring "agency is in the best position to make [the] cost realism determination" (citation and internal quotation marks omitted)).

Agile Def., Inc. v. United States, 959 F.3d 1379, 1385–86 (Fed. Cir. 2020); see also Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 358 ("The nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation.").

---

for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal." 48 C.F.R. § 15.404-1(d)(1).

Judges of this court have found that, in a fixed-price procurement, an agency is required to perform a price realism analysis when the solicitation expressly provides that the agency will evaluate price realism or states that "[t]he Government may reject any proposal that is . . . unreasonably high or low in price when compared to Government estimates, such that the proposal is deemed to reflect an inherent lack of competence of [sic] failure to comprehend the complexity and risks of the program." ViON Corp. v. United States, 122 Fed. Cl. 559, 573 (2015) (emphasis removed) (finding that such language commits the agency to conducting a price realism analysis); see also EMTA Isaat, A.S. v. United States, 123 Fed. Cl. at 338 (explaining that there "is no dispute that the plain language of the RFP required the government to conduct a price realism analysis" when the solicitation provided that "[a]ll offerors['] proposed prices will be evaluated to ensure they are realistic, reasonable, and complete"); D & S Consultants, Inc. v. United States, 101 Fed. Cl. at 33 (explaining that the parties agreed that the solicitation required a price realism analysis because it stated "[t]he Government may evaluate the offeror's proposed labor rates to determine if the proposed rates are unrealistically low in order to assess the ability of the offeror to meet the PWS requirements and whether the proposal provides the Government with a high level of confidence of successful performance"). In Afghan American Army Services Corp. v. United States, another Judge on this court determined that an agency was required to conduct a price realism evaluation because the solicitation stated that the agency would "evaluate price proposals to determine whether the offered price reflects a sufficient understanding of the contract requirements and the risk inherent in the offeror's approach" and that proposals with "an unreasonable (high or low) price may be deemed to be unacceptable and may not receive further consideration." Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 357 Similarly, in Rotech Healthcare, Inc. v. United States, the court concluded that a price realism analysis was required because the solicitation stated that an "unrealistically low price may be grounds for eliminating a proposal." Rotech Healthcare, Inc. v. United States, 121 Fed. Cl. 387, 404 (2015) (explaining that "the only reason any consideration of realism is necessary is the language in the RFP stating that unrealistically low offers may be eliminated").

Regarding price, the RFQ provides:

No adjectival ratings will be utilized for evaluating price. Price analysis will include a determination of whether the quoted price is fair and reasonable using the proposal analysis techniques at FAR 15.404-1 in accordance with DoD Class Deviation 2014-O0011. Comparison of proposed prices is expected to satisfy the requirement to perform a price analysis since competition normally establishes price reasonableness (FAR 15.404-1(a)(2)(i)). However, the Government may use various price analysis techniques described in FAR 15.404-1 to evaluate whether the proposed price is fair and reasonable. ODC/Travel CLIN prices provided by the Government, Labor award fee pool totals required to be 3% of quoted Labor fixed price totals, and Surge CLIN prices required to be 3% of quoted Labor fixed price totals will only be evaluated as part of the total evaluated price. Quoted maximum on-site and off-site Labor Hour (LH) rates for all personnel descriptions will be evaluated for reasonableness.

> Cost realism will be limited to the Fixed Price portion of the quotation and analyzed to evaluate whether the proposed cost elements are realistic for the work to be performed, reflect a clear understanding of the requirements, and are consistent with the unique methods of performance described in the Quoter's technical quotation.

In evaluating the offeror's price proposals, the February 25, 2021 Price/Cost Evaluation stated:

> The Price/Cost Evaluation Board (PCEB) used two price analysis techniques from FAR 15.404-1 and in accordance with DoD Class Deviation 2014-O0011 to evaluate the price/cost quotations. Normally, adequate price competition establishes a fair and reasonable price (FAR 15.403-1(c)(1)(i)). Thus, first, because of the competitive nature of this acquisition, which received three competitive responsive quotations, the PCEB found that all Quoters' prices were presumptively fair and reasonable. Second, to provide additional assurance that the proposed prices were fair and reasonable, the PCEB further analyzed the total evaluated price of each quotation by comparing proposed prices to each other and to historical prices.

The February 25, 2021 Price/Cost Evaluation determined:

> The PCEB considers the Quoters' total evaluated prices to be fair and reasonable as they are each not higher than the IGCE. Additionally, the IGCE is further confirmed to be an acceptable baseline as it is reasonably close (i.e., less than 20% higher) than the average of the three Quoters' total evaluated prices. FAR price analysis guidance was used to provide additional analysis for reasonableness. FAR 15.403-1(c)(1)(i) allows the following elements to establish a price is based on adequate price competition, and thus the PCEB was able to corroborate the method used with the following price reasonableness guidance from the cited FAR regulations:
>
> a) Two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement.
> * In response to this RFQ, three responsible Quoters, competing independently, submitted priced offers that satisfy the Government's expressed requirement.
>
> b) Award will be made to the offeror whose proposal represents the best value where price is a substantial factor in source selection.
> * Per the RFQ, award will be made to the Quoter whose quotation represents the best value, and although price is listed as significantly less important than the other six factors, it is still a substantial factor. In addition, it is noted the importance of price will increase as the other six non-price factors become closer in merit.

c) There is no finding that the price of the otherwise successful offeror is unreasonable.

* There is no finding, as documented below, that the price is unreasonable for any of the Quoters. Therefore, all technically acceptable proposals received are considered fair and reasonable based on adequate price competition.

Below is the reasonableness evaluation of quoted maximum on-site and off-site Labor Hour (LH) rates for all personnel descriptions:

ABII's quoted maximum (surge) on-site LH rates are reasonable as they were proposed in response to a competitive acquisition that the PCEB determined met FAR 15.403-1(c)(1)(i) requirements for establishing adequate price competition. Further, the proposed maximum (surge) on-site LH rates are approximately [redacted]% higher than the highest acceptable fully loaded labor rate for each labor category included in the fixed price labor totals. Their maximum (surge) off-site LH rates are also reasonable as they are [redacted]% higher than the highest acceptable fully loaded maximum (surge) on-site labor rate for each labor category included in the fixed price labor totals to also consider their [redacted]% contractor site overhead rate.

SecuriGence's quoted maximum (surge) on-site and off-site LH rates are reasonable as they were proposed in response to a competitive acquisition that the PCEB determined met FAR 15.403-1(c)(1)(i) requirements for establishing adequate price competition and they are [redacted] the acceptable fully loaded labor rates included in the fixed price labor totals.

[redacted] quoted maximum (surge) on-site and off-site LH rates are reasonable as they were proposed in response to a competitive acquisition that the PCEB determined met FAR 15.403-1(c)(1)(i) requirements for establishing adequate price competition and they are [redacted] the acceptable fully burdened labor rates included in the fixed price labor totals.

All Quoters complied with the RFQ and Government-provided spreadsheet in proposing 3% award fee on the MNSS fixed price.

The February 25, 2021 Price/Cost Evaluation continues:

Further, the PCEB compared the base year unburdened direct labor rates and fully burdened labor rates for the key personnel positions identified in the RFQ among the three Quoters and the IGCE. Only the key personnel positions are analyzed as a sample because they are the only guaranteed direct comparisons among all Quoters as the rest of the labor mix could be defined and quoted as desired by the Quoter. Based on this rate analysis,

the PCEB found all labor rates to be in-line with the other Quoters' proposed direct labor rates.

The Price/Cost Evaluation also included a comparison of the labor rates for the key personnel:

**Table 5. Comparison of Labor Rates of Key Personnel of the Phase II Quotes.**

| Position Title | Agile-Bot II ([redacted]% Base Profit) | | Agile-Bot II ([redacted]% Base Profit) | | SecuriGence | | [redacted] | | IGCE |
|---|---|---|---|---|---|---|---|---|---|
| | Labor Rate | Fully Burdened Rate ([redacted]% base profit rate) | Labor Rate | Fully Burdened Rate ([redacted]% base profit rate) | Labor Rate | Fully Burdened Rate | Labor Rate | Fully Burdened Rate | Fully Burdened Rate |
| Program Manager | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | $209.62 |
| Deputy Program Manager | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | $209.62 |
| Operations Manager | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | $156.08 |
| Security Manager - Information System Security Manager (ISSM) | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | $171.69 |
| Customer Relations Manager | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | 124.09 |
| Authorizations and Compliance Manager | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | 168.73 |
| Engineering and Development Manager | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | 206.46 |
| Configuration and Assets Manager | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | 128.82 |
| Quality Manager | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | 183.12 |
| Security Control Assessors | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | $161.58 |
| Site Connections Manager | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | 137.56 |

Defendant argues that "Counts I, II, and VI fail because the agency's price realism evaluation comported with the RFQ's evaluation scheme and was reasonable." Although disagreeing with the defendant's conclusions, at oral argument protestor agreed with defendant that "Counts 1, 2, and 6 are all interrelated in that they relate to the -- to DARPA's price realism analysis of the labor portion of the fixed price part of the contract." Protestor's counsel continued:

> I think when you distill our argument down to its nub, our position is that the sampling methodology that was done by DARPA was unreasonable because it did not account for anything other than the key personnel for the base year and it ignored the personnel that would be performing the contract in the out years.

Protestor's motion for judgment on the amended Administrative Record argues "[t]he RFQ required DARPA's price realism evaluation to encompass the entire fixed price portion of offerors' price/cost quotations, including evaluating whether all cost elements were realistic," but "[r]ather than considering the entire fixed-price portion of offerors' quotations and accounting for the entirety of each quoter's proposed labor rates (one of the cost elements required to be evaluated), however, DARPA strayed from the RFQ's evaluation scheme by implementing an overly narrow sampling methodology. Utilizing this method, DARPA only compared ABII and SecuriGence's base year key personnel labor rates in its labor rate analysis." Protestor further argues that "DARPA's chosen sampling method was also arbitrary and capricious," DARPA unreasonably based its price realism analysis on an overly limited sample of labor rates that amounted to only about one-tenth of the rates proposed by ABII or SecuriGence for the base year, and only about 1 percent of their respective labor rates proposed over the life of the contract."

In response, defendant notes that DARPA had "explained that it chose this sample because key personnel 'are the only guaranteed direct comparisons among all Quoters as the rest of the labor mix could be defined and quoted as desired by the Quoter.'" Defendant also argues that

> Agile-Bot makes it seem like the agency's comparison among quoters of proposed direct labor rates for key personnel in the base year was the full extent of the agency's realism analysis for direct labor rates. It was not. For instance, the agency also: (1) noted that SecuriGence's direct labor rates were based on historical labor data and salary surveys; (2) documented that SecuriGence proposed to provide incumbent staff [redacted] and, for others, salaries using [redacted] of industry-wide salary data; and (3) confirmed the mapping of SecuriGence's labor rates across all labor categories to similar categories in SecuriGence's FSS contract rates, including the proposed discount rates.

Moreover, defendant argues that "the agency did not assess the realism of the direct labor rates for approximately [redacted]% of the FTEs during the base year or [redacted]% of the FTEs over the life of the contract. Rather, the agency evaluated the realism of all of

the proposed direct labor rates," and "[a]lthough Agile-Bot would require the agency to compare each of the direct labor rates among the quoters to assess their realism, the RFQ did not require the agency to do so. Rather, the RFQ permitted the agency to assess the realism of proposed cost elements based on the supporting document that quoters provided, which DARPA did."

In its cross-motion for judgment on the amended Administrative Record, intervenor argues:

> The RFQ was not nearly as prescriptive with respect to the method of price realism evaluation as ABII contends. The Solicitation did not specify a particular method that DARPA would use to conduct the price realism evaluation. It did not require the price realism evaluation to "encompass the entire fixed-price portion" or to evaluate "all cost elements." Nor did it require a comparison of any particular number of labor rates between quoters. It did not even require that the price realism involve a comparison of labor rates between quoters at all. The Agency did not contravene the terms of the RFQ by declining to conduct a comparison between quoters of every labor rate across all years.

Intervenor also argues "[w]ith respect to the portion of DARPA's price realism evaluation that involved a comparison of key personnel labor rates, DARPA's decision to compare only key personnel labor rates was perfectly consistent with the RFQ. The RFQ did not specify a particular staffing mix, beyond requiring quoters to propose the key personnel positions." Intervenor also claims that ABII makes a "false premise that the Agency's price realism evaluation was limited to its comparison of key personnel labor rates between ABII and SecuriGence," and argues that DARPA "actually conducted a more thorough price realism analysis than just comparing the quoters' key personnel labor rates. ABII simply ignores the majority of the price realism evaluation. This failing is also fatal to its allegation that the price realism evaluation methodology was arbitrary and capricious."

Despite protestor's argument that DARPA used an overly narrow sampling methodology and argues that the RFQ required DARPA's price realism evaluation to encompass the entire fixed-price portion of offerors' price/cost quotations" to account "for the entirety of each quoter's proposed labor rates," the RFQ does not require any specific evaluation for the entire fixed-price portion of offerors' price/cost quotations. The RFQ states:

> Cost realism will be limited to the Fixed Price portion of the quotation and analyzed to evaluate whether the proposed cost elements are realistic for the work to be performed, reflect a clear understanding of the requirements, and are consistent with the unique methods of performance described in the Quoter's technical quotation.

Although protestor cites to <u>KWR Construction, Inc. v. United States</u>, 124 Fed. Cl. 345 (2015), which found that the Air Force's price realism analysis was not consistent with the

requirements of the RFP at issue, that decision does not resolve the issues in the above captioned protest. See generally id. In KWR Construction,

> [t]he RFP provided that the government would determine price *realism* based on an evaluation of "the individual line items of the demonstration project proposal." In contrast, the RFP stated that the government would assess price *reasonableness* based on a comparison of each offeror's total proposed price to historical prices for similar efforts and to the IGE, and a consideration of price competition obtained by other offers.

> The agency's comparisons of KWR's total proposed price and total direct costs to the IGE and the average for technically acceptable offers apply the RFP's price reasonableness criteria to the evaluation of price realism. This distinction is important in this case because a substantial portion of the gap between KWR's total proposed price and the IGE's total price is due to acknowledged errors in the IGE. For example, as the government acknowledges, the IGE was not revised to reflect amendments to the solicitation. In particular, the total price in the IGE includes at least [...] in design work that was removed from the demonstration project. In addition, the total demonstration project price listed in the IGE includes [...] that is not explained in the record. Finally, the elimination of unnecessary direct costs in the IGE would also reduce the percentage-based indirect costs for profit, overhead, tax, and bonding. KWR's total evaluated price includes [...] less than the IGE for indirect costs of overhead, profit, tax, and bonding. In *Afghan American Army Services Corp. v. United States,* the court found that an agency failed to conduct a sufficient price realism analysis by relying on an IGE that included "irrational assumptions or critical miscalculations." 90 Fed. Cl. at 359. In that case, the agency erred by making awards to low priced offerors based on a comparison of proposed prices to an IGE that incorrectly excluded a category of work covered in the proposals. *Id.* In this case, the government rejected KWR's low priced offer based, in part, on a comparison to an IGE that includes costs which should have been removed.

> The June 26, 2015 proposal analysis report also claims that the agency was most concerned with the "vast departure from comparison points" with regard to electrical work and that while the other differences might not be significant, KWR's pricing for electrical work reflects a lack of understanding of the demonstration project requirements. This conclusion appears to be based on a comparison of KWR's subtotal for electrical work to the subtotal for electrical work in the IGE. While the June 26, 2015 proposal analysis report shows which line items in KWR's price proposal the agency counted as electrical work, there is no discussion of whether any of the electrical line items are priced realistically in comparison to line items in the IGE. At oral argument, counsel for the government also acknowledged that the only SSEB evaluator who commented on KWR's understanding of the

demonstration project requirements discussed subtotals for mechanical work and electrical work but did not evaluate costs for individual line items.

Id. at 357-58 (emphasis and alterations in original; internal citations and footnotes omitted). The Judge in KWR Construction, therefore, determined "that the agency committed to a methodology for conducting a price realism analysis in the solicitation and that the agency did not follow that methodology in evaluating and rejecting KWR's proposal," id. at 357, and concluded:

> [T]he agency did not comply with the RFP and that this error was prejudicial to KWR. The RFP did not give the agency discretion to ignore its obligation to look at individual line items in making its decision and, had the agency conducted a line item analysis, as KWR argues and as discussed below, the agency would have seen that its concerns about KWR's understanding of the demonstration project requirements were not supported.

Id. at 358-59. This court agrees with the Judge in KWR Construction that "'the nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation,'" id. at 357 (quoting Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 358). In the protest currently before this court, DARPA did not commit itself to a "particular methodology" for its price realism analysis.

> In addition The February 25, 2021 Price/Cost Evaluation explained:

> Further, the PCEB compared the base year unburdened direct labor rates and fully burdened labor rates for the key personnel positions identified in the RFQ among the three Quoters and the IGCE. Only the key personnel positions are analyzed as a sample because they are the only guaranteed direct comparisons among all Quoters as the rest of the labor mix could be defined and quoted as desired by the Quoter. Based on this rate analysis, the PCEB found all labor rates to be in-line with the other Quoters' proposed direct labor rates.

Therefore, a comparison between the offerors of the direct labor rates "found all labor rates to be in-line with the other Quoters' proposed direct labor rates." Notably, the comparison between the proposed escalation rates for the direct labor rates between ABII and SecuriGence demonstrated [redacted] escalation rates and both ABII's and SecuriGence's escalation rates were found to be realistic. For ABII, the February 25, 2021 Price/Cost Evaluation explained:

> *Escalation:* ABII's proposed escalation rate is [redacted]% for employee compensation, which is [redacted] than the actual rate reported on March 2020 by the Department of Labor Bureau of Labor Statistics (BLS) that was cited in ABII's quotation (Vol IV, Appendix C – Bureau of Labor Statistics Employment Index March 2020). ABII stated that since the rate fluctuates

every quarter, they utilized the most frequently reported rate within the report ([redacted]%). (Vol IV, Eval Factor 7, page 14). This justification is acceptable to the Government. In assessing the realism of the proposed escalation rate of [redacted]%, the PCEB relied on IHS Markit Forecast labor rate data provided by DCAA. The IHS data shows projected annual labor rate escalation for average hourly rates for Professional, Scientific and Technical Services employees. The data shows an average year over year escalation rate of [redacted]% from 2021 through 2027. Based on this data and supporting documentation provided by ABII, the PCEB considers the proposed escalation of [redacted]% to be realistic.

(emphasis in original). For SecuriGence, the February 25, 2021 Price/Cost Evaluation explained

> *Escalation:* SecuriGence stated in its quotation that direct labor costs for all staff for this contract will be escalated at the beginning of each [redacted], rather than at the beginning of the [redacted] (Phase II – Volume IV Price/Cost, pages 9 and 10). SecuriGence is proposing an escalation rate of [redacted]% each year to the direct labor rates for all option periods. SecuriGence stated that they took into consideration the Bureau of Labor Statistics and U.S. Department of Labor data included in its proposal in considering an appropriate escalation factor to apply. As stated in its quotation, they have selected an annual escalation factor of [redacted]%, which is [redacted] the Employment Cost Index and US Inflation calculator, because they stated [redacted]. In assessing the realism of the proposed escalation rate of [redacted]%, the PCEB relied on IHS Markit Forecast labor rate data provided by DCAA. The IHS data shows projected rate escalation for average hourly rates for Professional, Scientific and Technical Services employees. The data shows an average year over year escalation rate of [redacted]% from 2021 through 2027. Based on this data, the PCEB considers the proposed escalation of [redacted]% to be realistic.

(emphasis in original).

Furthermore, the February 25, 2021 Price/Cost Evaluation emphasized that both ABII and SecuriGence offered "unique methods of performance." For ABII, the February 25, 2021 Price/Cost Evaluation summarized:

> ABII's price/cost quotation is determined to [sic] realistic for the work to be performed, reflects a clear understanding of the requirements, and is consistent with the unique methods of performance described in the Quoter's technical quotation. ABII's focus on supporting engineering and operations capabilities, as described in the Technical Approach, is demonstrated by the Engineering and Operations staff levels meeting and exceeding the proposed levels in the IGCE. Based upon the PCEB's thorough review of documentation provided by ABII, considering their proposed labor hours, direct labor rates, fringe, overhead, G&A, SM&H, escalation, proposed base fee/profit, and other price/cost considerations,

there is negligible potential to cause degradation of performance or issues with retention and recruitment of personnel, so ABII receives a "Low Risk" Performance Risk Rating.

Similarly for SecuriGence, the February 25, 2021 Price/Cost Evaluation summarized,

based on the preceding analysis, the SecuriGence price/cost quotation is determined to be realistic for the work to be performed, reflects a clear understanding of the requirements, and is consistent with the unique methods of performance described in the Quoter's technical quotation. SecuriGence's strengths in [redacted] realm of the Technical Approach with regard to the assessment of the [redacted] and [redacted], is demonstrated by the focus on [redacted] personnel. Based upon the PCEB's thorough review of documentation provided by SecuriGence, considering their proposed labor hours, direct labor rates, fringe, overhead, G&A, SM&H, escalation, proposed base fee/profit, and other price/cost considerations, there is negligible potential to cause degradation of performance or issues with retention and recruitment of personnel, so SecuriGence receives a "Low Risk" Performance Risk Rating.

Therefore, it did not make sense for DARPA to conduct a side by side comparison of the offerors' proposals to determine if they were realistic and DARPA offered a reasonable explanation for why only the key personnel positions were compared for each offeror.

Additionally, the court notes that key personnel and direct labor rates were not the only criteria that DARPA used to evaluate SecuriGence's proposal for realism. The February 25, 2021 Price/Cost Evaluation explained, in part:

Cost Realism:

SecuriGence's supporting price quotation documentation included all of the example individual cost element information requested in the RFQ in order for the Government to determine the realism of the proposed quotation.

*Direct labor rates:* As stated in its quotation (page 6, Phase II – Volume IV Price/Cost), SecuriGence's labor rates are based on historical labor data from successful staffing of similar personnel as well as salary surveys. SecuriGence has stated they will bid incumbent staff [redacted]. For non-incumbent staff, SecuriGence proposed salaries using [redacted]. SecuriGence noted in its quotation that its salary research is [redacted], which they then [redacted]. As stated in its quotation, by [redacted], they believe they achieve more accurate and balanced results. They stated they then [redacted]. The results of their salary survey and related calculations are detailed in the Salary Survey tab of their submitted spreadsheet: *SecuriGence_DARPA ITD MNSS Phase II Volume IV Details.xlsx*. SecuriGence also noted in its quote that salaries [redacted].

SecuriGence stated in their quotation that direct labor rates are based on a [redacted] total hour manyear, [redacted] to calculate the direct hourly rate (Phase II – Vol IV, page 8). As required, SecuriGence mapped its labor categories to the most similar GSA contract labor categories, and they provided a discount off each labor rate. The average discount to its GSA contract labor rates across all labor categories is [redacted]. The PCEB confirmed that the proposed direct labor rates do match and reflect a discount to SecuriGence listed GSA rates under its current GSA contract GS-35F-626GA. As presented in Table 5 above, the PCEB compared the base year unburdened direct labor rates and fully burdened labor rates for the key personnel positions identified in the RFQ among the three Quoters and the IGCE; and based on this rate analysis, the PCEB found SecuriGence labor rates to be in-line with the other Quoters' proposed direct labor rates. Based on the preceding analysis and documentation provided by SecuriGence, the PCEB finds the proposed direct labor rates to be realistic for use in the development of the price quotation for the MNSS contract.

*Fringe:* SecuriGence proposed [redacted] fringe rate of [redacted] and applied this rate to [redacted] in calculating total fringe costs and burdened labor rates. SecuriGence provided a description in its quotation of the cost elements that make up the cost pool and base for its proposed fringe rate (Phase II – Volume IV, Price/Cost, page 7). Based on the PCEB's review of the elements that make up the fringe cost pool and base, the PCEB did not object to the method used by SecuriGence to develop its fringe rate. [redacted]. However, the PCEB did receive from DCAA SecuriGence's 2019 Incurred Cost Submission, which showed that SecuriGence claimed a fringe of [redacted]% for 2019. [redacted], this 2019 fringe rate of [redacted]% is in-line with the proposed fringe rate of [redacted]% for the [redacted]. Additionally, as evident in Table 4 above, the PCEB compared the proposed fringe rate against the proposed fringe rates submitted by the other small businesses that submitted a price/cost quotation to this RFQ and found the fringe rates to be in line with each other. Based on the preceding analysis, the PCEB finds that the proposed fringe rate is applied to proper bases within SecuriGence's cost element buildup, and the fringe rate is realistic for use in the development of the price quotation for the MNSS contract.

*Overhead:* SecuriGence proposed an Overhead (OH) rate of [redacted] periods and [redacted] in calculating total OH costs and burdened labor rates. SecuriGence provided a description in its quotation of the cost elements that make up the cost pool and base for its proposed OH rate (Phase II – Volume IV Price/Cost, page 7). As described in its quotation, SecuriGence captures costs in its OH pool associated [redacted]. For this reason, SecuriGence has a [redacted]. Notwithstanding, SecuriGence noted in its quotation that it [redacted] (Phase II – Volume IV Price/Cost,

page 7). Based on the PCEB's review of the elements that make up the OH cost pool and base, the PCEB did not object to the method used by SecuriGence to develop its OH rate. [redacted]. However, as noted above, the PCEB did receive from DCAA SecuriGence's 2019 Incurred Cost Submission, which showed that SecuriGence claimed an OH of [redacted]% for 2019. [redacted], this 2019 OH rate of [redacted]% is of [redacted]% for the [redacted]. As stated in its quotation, SecuriGence developed its provisional indirect rates based on [redacted]. For this reason, the proposed OH rate is [redacted] because SecuriGence [redacted]. The PCEB considered this assumption by SecuriGence reasonable in its development its indirect rates. Additionally, as evident in Table 4 above, the PCEB compared the proposed OH rate against the proposed OH rates submitted by the other small businesses that submitted a price/cost quotation to this RFQ and found the OH rates to be in line with each other. Based on the preceding analysis, the PCEB finds that the OH rate is applied to proper bases within SecuriGence's cost element buildup, and the proposed OH rate is realistic for use in the development of the price quotation for the MNSS contract.

. . .

*Labor Hours:* SecuriGence stated on page 3 of its Phase II – Volume IV, Price/Cost submission the following on the rationale for their proposed level of effort to further acceptably support a realistic cost:

> [redacted]. We applied the following judgmental factors in our basis of estimate: [redacted]. Level Of Effort (LOE) amounts were determined [redacted]. We also [redacted]. We then applied [redacted]. Finally, we compiled the results of our [redacted], creating a [redacted]approach that is the most probable and lowest-risk total LOE.

In addition, when comparing quoted labor hours against IGCE in Table 6, SecuriGence [redacted] showing a realistic approach. Finally, when compared to IGCE for broad Team categories in Table 7 SecuriGence has allocated their resources appropriately and in accordance with their unique approach outlined in Factors 2 and 3. SecuriGence's approach supports the Government's confidence that the cost is realistic as it accounts [redacted].

Overall, in consultation with the TEB, the cost elements are realistic for the work to be performed. The Quoter's labor rates and number of labor hours reflect a clear understanding of the requirements and are consistent with the unique methods of performance described in the contractor's technical quote.

(all emphasis in original).

Protestor additionally. alleges that "the Agency conducted an unreasonable evaluation of SecuriGence's Price under Factor 7," and argues "DARPA failed to adhere to the RFQ's evaluation scheme by ignoring the significant risk posed by SecuriGence's low price, resulting in the erroneous assessment of a Low Risk rating to SecuriGence's price quotation," specifically because "DARPA failed to consider risk posed by SecuriGence's price given its low labor rates and salaries." In response, defendant argues "Agile-Bot simply disagrees with the agency's considered assessment that SecuriGence's total labor hours and total FTEs are realistic. The agency documented its analysis of the realism of the proposed labor hours and FTEs, as cost elements of the fixed priced portion of the quotes, in accordance with the RFQ." As noted above, DAPRA determined "in consultation with the TEB, the cost elements are realistic for the work to be performed. The Quoter's labor rates and number of labor hours reflect a clear understanding of the requirements and are consistent with the unique methods of performance described in the contractor's technical quote."

Protestor also alleges

Given SecuriGence's promise to [redacted], the Agency should have been concerned given that SecuriGence's price is lower than ABII's (whose mentor member is performing under the incumbent effort) even though it proposed many more FTEs and labor hours than ABII. This simply does not add up. SecuriGence is either going to pay its employees rock bottom salaries, hire inexperienced individuals, or perform at a loss—all of these scenarios pose a risk to performance that DARPA should have considered in its evaluation. It did not do so.

The court notes that February 25, 2021 Price/Cost Evaluation indicated

the PCEB compared the total labor hours and full-time equivalents (FTEs) quoted to each other, the average, and the IGCE and found each Quoters' hours to be within an acceptable range, with exceptions noted below for [redacted], to be considered realistic:

Table 6. Comparison of Total and Total Average Annual Labor Hours/FTEs by period to the IGCE for the Phase II Quotes.

|  | Agile-Bot II | SecuriGence | [redacted] | Average | IGCE |
|---|---|---|---|---|---|
| **Total Labor Hours** | [redacted] | [redacted] | [redacted] | [redacted] | 360,960 |
| **Total FTEs*** | [redacted] | [redacted] | [redacted] | [redacted] | 188 |

*For the purposes of comparing proposed FTEs to the IGCE on a level basis, the PCEB used 1,920 labor hours as one FTE

(emphasis in original). Defendant notes that "SecuriGence proposed [redacted] annual FTEs (and their attendant labor hours), which is only [redacted] more FTEs than Agile-Bot's proposed [redacted] FTEs." Similarly, intervenor argues

> ABII does not explain why SecuriGence's slightly higher total hours (about [redacted] FTEs) and a slightly lower total price (4.6%) than ABII proves "mathematically" that SecuriGence's labor rates are below-market or [redacted], as ABII originally argued, or "rock bottom." ABII makes no attempt to prove that SecuriGence's specific labor rates were too low, instead speculating about what SecuriGence "must have proposed" even though its quotation is in the Administrative Record.

(footnote omitted).

Defendant argues that "Agile-Bot can identify nothing in the RFQ that required the agency to assign SecuriGence a higher risk rating for its total evaluated price," argues that ABII is "[m]erely disagreeing with the agency's considered assessment of SecuriGence's price." As noted above in both <u>KWR Construction, Inc. v. United States</u> and <u>Afghan American Army Services Corp. v. United States</u>, "the nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation." <u>KWR Constr., Inc. v. United States</u>, 124 Fed. Cl. at 357; <u>Afghan Am. Army Servs. Corp. v. United States</u>, 90 Fed. Cl. at 358. As determined above, the requirements of the realism analysis was "limited to the Fixed Price portion of the quotation and analyzed to evaluate whether the proposed cost elements are realistic for the work to be performed, reflect a clear understanding of the requirements, and are consistent with the unique methods of performance described in the Quoter's technical quotation." DARPA's realism analysis was within the "sound exercise of the agency's discretion," and protestor has not demonstrated that the analysis was arbitrary or capricious.

Separate from the methodology, protestor alleges that "DARPA Unreasonably Determined that ABII's price revisions were noncompliant with EN Instructions," claiming "DARPA arbitrarily and capriciously found ABII's revision to its MNSS base fee to be noncompliant with the instructions set forth in ABII's Exchange Notice ('EN') and ignored information contained in ABII's quotation revisions based solely on its overly narrow reading of the EN's instruction." Protestor claims that

> ABII responded to the EN by removing its originally proposed [redacted] percent Commodity IT Support Services award fee, which reduced its TEP by a total of $[redacted]. ABII also reduced its MNSS base fee from [redacted] percent to [redacted] percent due to its removal of the Commodity IT Support Services award fee. ABII's justification for the reduction to its MNSS base fee explained how the removal of the Commodity IT Support Services award fee also required it to reduce its MNSS base fee to maintain balanced pricing, i.e., removal of the Commodity IT Support Services award fee materially impacted the MNSS

base fee, as well as other portions of ABII's price quotation, such that it could have become unbalanced if the MNSS base fee was not removed.

Protestor argues that

DARPA, however, did not consider this information because of the restrictive reading of the EN's instructions it employed during the quotation revision evaluation. Based on this flawed reading of ABII's price revisions and its justification supporting the same, DARPA improperly determined that ABII's price revisions did not comply with the EN instructions because ABII had purportedly failed to provide either (1) a clear nexus between, or (2) describe the material impact of, removing its Commodity IT Services award fee on its MNSS base fee.

Defendant responds that this argument "fails because DARPA rejected Agile-Bot's final quote revision MNSS base fee reduction in accordance with the Exchange Notice instructions" and "Agile-Bot's challenge to the agency's rejection of its proposed MNSS base fee reduction is mere disagreement with the agency's sound judgment that Agile-Bot failed to establish that such a reduction had a clear nexus to or was materially impacted by the reduced Commodity IT Services award fee." Similar to defendant, intervenor argues that "ABII's protest is mere disagreement with the Agency's reasonable, considered judgment. It should therefore be denied." Additionally, intervenor claims: "ABII argues that rejecting its price reduction improperly 'decreased' or 'prejudiced' its chances of award because it allegedly made ABII's pricing unbalanced within the meaning of FAR 15.404-1(g). But this is false, because *the Agency did not, in fact, reject ABII for unbalanced pricing* after rejecting its price reduction. "(emphasis in original). Intervenor continues, "[a]nd the award to SecuriGence was not based in any way on concerns about ABII's pricing balance—no such concerns existed to reduce ABII's likelihood of winning the award."

As indicated above, DARPA initially made an award to SecuriGence on October 9, 2020, and in response, ABII filed a protest with the GAO, which was dismissed on October 27, 2020, after DARPA indicated it would take corrective action. After GAO dismissed the protest, DARPA informed ABII, SecuriGence, and [redacted] of the corrective action and explained that DARPA would engage in discussions with the offerors via Exchange Notices on November 18, 2020. The Exchange Notices indicated:

The Defense Advanced Research Projects Agency (DARPA) recently took corrective action following a protest filed with the Government Accountability Office for the subject RFQ. After re-evaluating quotes, I have decided to engage in exchanges with all Phase II Quoters as authorized by RFQ Attachment 3, paragraph 1. The attached exchange notice notifies you of exchanges for your quote. You may address the attached exchange notice by providing a final quote revision. However, final quote revisions are limited to changes that are within the scope of the attached exchange notice. Any price/cost changes must fully explain how such changes have

a clear nexus to and are materially impacted by the attached exchange notice. Any final quote revisions that change aspects of the quote outside the scope of the attached exchange notice will be deemed non-compliant and not evaluated by DARPA.

On November 23, 2020, ABII, SecuriGence, and [redacted] all submitted questions to DARPA, and on November 27, 2020, DARPA responded to the questions. Relevant to the above captioned protest, one exchange between ABII and DARPA was as follows:

To assist us with mitigating any assumed operational risk or burden with this proposed fluctuation in Fee/Profit, ABII respectfully requests the Government confirm offerors are indeed allowed to make changes to their proposed Base Fee.

- Yes the government confirms that an increase in proposed base fee has a clear nexus to removing award fee from the commodity CLINs with respect to overall operational risk and would therefore be a permitted change to the quote.

On December 7, 2020, all three offerors submitted final, revised proposals. Included with ABII's was the following note:

ABII deviated from RFQ instructions by editing a formula contained within the Government-provided spreadsheet. ABII added [redacted]% award fee to the Commodity IT Support Services.

o **Response:**
Per the Government's instructions, ABII has corrected our pricing model to remove the [redacted]% award fee related to the Commodity IT Support Services costs. ***This reduced our price/cost by a total of $***[redacted]***.*** The affected cells are highlighted in yellow under the CLIN Totals tab (Row 7, 8 and 11; Columns E, G, I, K, M, O, Q, S, U and V) in **DARPA MSO ITD MNSS - Volume IV - Agile-Bot II.xlsx.** In addition, the removal of the [redacted]% award fee from the Commodity IT Support Services has materially impacted our overall Price/Cost Proposal strategy. The following paragraphs explain how the removal of the [redacted]% award fee has a material impact on and clear nexus to the Exchange Notice.

**Consequential Material Impact: Net Impact is a proposed savings of $**[redacted]**).**

ABII's internal proposal pricing standard practices require us to provide balanced pricing to our customers, such that all work requirements under the same contract have the same fee/profit across CLINs, with the exception of cost reimbursement CLINs (such as Travel and ODCs). ABII has historically found that sound operational focus and exceptional

technical support is better realized through a balanced fee approach. This way the Program Manager can focus his or her attention on the core mission instead of on internal Profit & Loss (P&L) statements. In accordance with our standard practices, we have reduced the Base Fee on the Multi-Network Support costs from [redacted]% to [redacted]%. The combined total fee for the Multi-Network Support is now set at [redacted]% ([redacted]% Base Fee and [redacted]% Award Fee). The Commodity IT Base Fee remains at [redacted]% ([redacted]% Base Fee and [redacted]% Award Fee per the Exchange Notice. ***In summary, both total/combined fee maximums (Base Fee plus Award Fee) for Commodity IT and Multi-Network are now at*** [redacted] ***%, which results in a balanced application of fee/profit that is consistent with our standard practices.*** This change does not create risk for DARPA, since there have been no adjustments to proposed salaries, proposed staffing levels or man-year hours beyond the adjustment to the Quality Manager salary discussed in the next Exchange. The changes are highlighted in yellow in Column X in the following tabs: Base Period, Option Period 1, Option Period 2, Option Period 3, Option Period 4, Option Period 5, Option Period 6, Option Period 7, Option Period 8. In addition, under the CLIN Totals tab (Row 3, 4, 5 and 10; Columns E, G, I, K, M, O, Q, S, U and V). ***The reduction in Base Fee for the Multi-Network Support costs reduced our price by $*** [redacted]***.***

(all emphasis in original). During the agency's evaluation of the revised proposals, the contracting officer filed a February 10, 2021 Memorandum for Record with the subject line: "Rejection of Non-Compliant Revised MNSS (Support Services) Base Fee in the Final Quote Revision of Agile-Bot II (ABII)." The February 10, 2021 Memorandum for Record determined the reduction from [redacted]% to [redacted]% was non-compliant, explaining:

After consulting with the price/cost team and reviewing ABII's rationale summarized in paragraph 5 above, I decided to reject ABII's price/cost revision that reduced the quoted fee for MNSS base fee from [redacted]% to [redacted]%. My determination included the following considerations:

a) ABII failed to establish that DARPA's Exchange Notice permitting ABII to revise (reduce) its Commodity IT Services award fee is expected to have a material impact on its MNSS base fee, and that such impact materially requires ABII to also reduce its MNSS base fee. ABII's quoted reduction to its Commodity IT Support Services award fee was not inextricably linked to reducing its quoted reduced MNSS base fees, specifically, reducing the former fee did not inextricably require ABII to also reduce the latter fees. As summarized in paragraph 5 above, ABII stated that it reduced its MNSS base to follow its standard business practices. ABII's internal business practices, however, are inadequate to explain how its decision to revise (reduce) its quoted Commodity IT Support Services fee materially impacted, and was inextricably linked to a causal necessity to lower the prices of its

MNSS base (support costs) fees. Rather, ABII's decision to reduce its MNSS base (support costs) fees was admittedly motivated by its business practices, not by materiality, causation, or nexus of the fees to one another.

b) ABII failed to explain how reducing the award fee on the Commodity IT Support Services CLIN (i.e., reducing total amount of potential fee that it could earn during performance of the task order) has a direct nexus with respect to contract risk in reducing the MNSS (support services) base fee. A reduction of [redacted]% award fee of the Commodity IT Support Services CLIN increases ABII's operational risk of earning profit on the task order. A rational nexus to reducing the Commodity IT Support Services fee would have been, for example, to increase the potential amount of base fee ABII could earn elsewhere under the task order, for instance it could have increased (not decreased) the MNSS (support services) base fee to help ensure that reducing the Commodity IT Support Services fee did not increase overall operational risk of not earning profit on the task order. DARPA alluded to this rationality in the response reproduced in paragraph 3 above by stating, "[T]he government confirms that an **increase** [emphasis added] in proposed (MNSS) base fee has a clear nexus to removing award fee from the commodity CLINs with respect to overall operational risk and would therefore be a permitted change to the quote". But there was no indication by DARPA that a **decrease** in the MNSS (support services) base fee has a clear nexus to removing award fee from the commodity CLINs with respect to overall operational risk and would therefore be a permitted change to the quote. Furthermore, ABII did not provide any explanation as to how a reduction in the MNSS (support services) base fee would mitigate operational risk or burden due to the decrease in Commodity IT Support Services award fee.

c) ABII's final quote revision did not provide sufficient evidence that ABII's revision (decrease) of its MNSS base fees in response to the Exchange Notice was inextricably linked to, caused by or had a clear nexus to its revision to Commodity IT Support Services fee. For example, ABII's Final Quote Revision Volume IV-Price/Cost does not describe the rationale for, or document, its asserted standard business practice of having same profit/fee across CLINs, including not in the following sections of its final price/cost quote: 1.4 Balanced Pricing, 1.5.1 Accounting System, 1.7.1 Proposed Base Fees, and 1.7.2 Award Fee. Moreover, within Section 1.7.2, ABII admitted that award fee is not guaranteed: "Agile-Bot II understands that award fee pools is [*sic*] not guaranteed and is an incentive to exceed requirements and award fee criteria." ABII Final Quote Revision Volume IV, p. 14. However, ABII failed to explain how its program manager will not be more focused on the MNSS (support service) effort, since [redacted]% of the total [redacted]% available fee is not guaranteed and is only earned as an incentive for exceeding requirements. In other words, I do not agree with ABII's assertion that a quoted [redacted]% award fee and [redacted]% base

fee is a balanced fee approach, particularly where the Commodity IT Support Services CLIN includes a guaranteed [redacted]% base fee. In my contracting officer experience, I have found that contractor program managers are significantly incentivized by award fees and that they put additional effort into earning award fee for their company. In my business judgment, I believe that such incentivization will be particularly significant under this task order, where only [redacted]% fee is guaranteed for the MNSS (support services) effort (i.e., CLIN 0001 in the base period) and anticipate this arrangement would have the exact affect ABII is apparently trying to avoid by incentivizing their program manager to focus on earning the [redacted]% non-guaranteed award fee.

d) It would require DARPA to engage in unequal treatment of the Quoters if it allowed ABII to not follow the Exchange Notice instructions by making non-compliant changes to its price quote whereas the other Quoters followed the Exchange Notice instructions and did not make non-compliant changes to their price quotes. I determined it would be unfair to other Quoters, and detrimental to the integrity of the procurement system, if the price/cost team determined ABII's non-compliant revisions to its price quote were compliant (e.g., within the scope of the Exchange Notice) and evaluated it as part of determining ABII's revised quoted price.

In view of the considerations above, I determine that ABII's revision of its MNSS (support services) fee in its final quote revision — impermissibly reducing base fee from [redacted]% to [redacted]% — are non-compliant with DARPA's Exchange Notice instructions and, therefore, will not be evaluated.

7. I have directed the price/cost team to conduct two evaluations. First, to provide the Decision Authority with information to conduct his own independent review of ABII's final quote revision, I directed the price/cost team to evaluate ABII's price/cost quote as submitted, and to evaluate ABII's non-compliant revision to its MNSS (support services) fee. Second, I directed the price/cost team to separately evaluate ABII's price/cost quote given my decision to reject the non-compliant portion of the final quote revision. I further directed the price/cost team to disregard ABII's non-compliant reduction in the MNSS (support services) base fee from [redacted]% to [redacted]% and to evaluate ABII's final price MNSS (support services) base fee at [redacted]% as originally quoted by ABII.

(emphasis and alterations in original). Despite the through and detailed explanation by the contracting officer, as noted above, ABII contends that "DARPA arbitrarily and capriciously found ABII's revision to its MNSS base fee to be noncompliant with the instructions set forth in ABII's Exchange Notice ('EN') and ignored information contained in ABII's quotation revisions based solely on its overly narrow reading of the EN's instruction." Defendant, however, correctly notes that "Agile-Bot acknowledges that the

agency applied the Exchange Notice instructions verbatim." Moreover, defendant claims that "Agile-Bot does not contend with most of the conclusions in that memorandum [the February 10, 2021 Memorandum for Record]. Indeed, Agile-Bot does not challenge the overarching conclusion therein that its internal pricing practices are insufficient to establish such a clear nexus." Instead, as noted above, defendant argues, "Agile-Bot's challenge to the agency's rejection of its proposed MNSS base fee reduction is mere disagreement with the agency's sound judgment that Agile-Bot failed to establish that such a reduction had a clear nexus to or was materially impacted by the reduced Commodity IT Services award fee." Notably, the source selection authority determined regarding ABII's revised price proposal:

> For ABII for Factor 7, I concur with the Contracting Officer's Memorandum for Record (MFR), dated February 10, 2021, that documented non-compliant quote revisions that ABII made to their price quote during Exchanges. Specifically, I concur with the Contracting Officer that ABII's reduction of its quoted MNSS base (support costs) fees from [redacted]% to [redacted]% is non-compliant because reducing these fees did not have a clear nexus to and was not materially impacted by the relevant Exchange Notice to revise (reduce) its Commodity IT services fee. These non-compliant revisions resulted in ABII's quoted price being $[redacted] lower than ABII's total evaluated price cited above ($819,569,555), or $[redacted]. I carefully reviewed ABII's rationale for making these non-compliant revisions, specifically that they were required based on their internal standard business practices to provide balanced pricing and fee approaches. ABII's business rationale offered for making the revisions does not adequately explain and fails to establish how ABII's revision to the Commodity IT Services fee in response to the Exchange Notice materially impacted and had a clear nexus to requiring ABII to also reduce its MNSS base fees. I found ABII's rationale failed to explain how revisions to the Commodity IT services fee was inextricably linked to requiring ABII to reduce the MNSS base fees. I believe that ABII's business rationale for making the non-compliant quote revisions was not sufficient to establish the causal nexus (not business nexus, as ABII would apparently have it) required by the Exchange Notice instructions. Consequently, I concur with the Contracting Officer's MFR, and I determined that ABII's revisions to its MNSS base fees were non-compliant with the Exchange Notice instructions. The instructions specifically notified all Quoters that any price/cost changes must fully explain how such changes have a clear nexus to and are materially impacted by the Exchange Notice. Further, the instructions stated, that any final quote revisions that change aspects of the quote outside of the scope of the Exchange Notice will be deemed non-compliant and not evaluated by DARPA. Thus, I rejected ABI''s revisions to its MNSS base fees- totaling $[redacted]-and these revisions are not included in ABII's total evaluated price above. I also found, from an equal treatment perspective, that SecuriGence and [redacted] followed the Exchange Notice instructions and did not submit non-compliant quote

> revisions as part of their final quote revisions. I believe it would be unfair to SecuriGence and [redacted] if I accepted ABII's non-compliant price quote revisions discussed above. I would have to treat ABII unequally, and more preferentially, than SecuriGence and [redacted] if I decided to accept ABII's non-compliant final quote revisions. I consider this matter further as part of my trade-off summary and best value determination below.

(capitalization in original). The court determines that both the contracting officer's conclusions and the source selection authority's conclusions regarding the revision of protestor's price proposal were reasonable.

ABII also claims that the "removal of the Commodity IT Support Services award fee materially impacted the MNSS base fee, as well as other portions of ABII's price quotation, such that it could have become unbalanced if the MNSS base fee was not removed." The court notes, however, the source selection authority did not find the price, absent the removal price revision, to be unbalanced. Instead, the source selection authority stated:

> For Factor 7, I find ABII's quote, as evaluated and not considering the non-compliant price revisions discussed above, to be reasonable and realistic. I determine ABII's quote to contain negligible potential to cause degradation of performance or issues with retention and recruitment of personnel.

The court finds that the agency did not act arbitrarily and capriciously in removing the price revisions from ABII's proposal. Even if DARPA acted arbitrarily and capriciously and improperly determined that ABII's price revisions did not comply with the EN instructions, the protestor must still demonstrate prejudice. As noted above:

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351. Similarly stated, to prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706; see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial); Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1326; Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33.

As explained by the source selection authority in the Best Value Determination and Task Order Award Decision:

> I agree with the Contracting Officer's decision to reject the non-compliant portion of ABII's final quote that decreased the base fee on the Multi-Network Support Services. As stated by the Contracting Officer, I agree that it would be unfair to the other Quoters, and in my opinion, detrimental to the integrity of the procurement system, if the price/cost team determined ABII's non-compliant revisions to its price quote were compliant (e.g., within the scope of the Exchange Notice) and evaluated it as part of determining ABII's revised quoted price. However, even if the quote revision of reducing base fee had been compliant with the Exchange Notice, which it was not, it still would not have changed my best value decision. More specifically, even with a price premium of up to $[redacted], or about $[redacted] per year, ABII's quote would still not be worth awarding over SecuriGence's quote which offers essentially equal technical value at a much lower price. Thus, even if I would have accepted ABII's non-compliant price revisions, which I do not, I would still find that SecuriGence's quote offers better value to DARPA than ABII's quote.

Therefore, even if DARPA had wrongly concluded that the price revisions in ABII's final revised proposal were non-compliant, ABII has not demonstrated that such a decision prejudiced protestor. In sum, DARPA properly concluded that protestor's price revisions did not comply with the EN instructions, and moreover, protestor has not demonstrated prejudice.

SCIF Space

Additionally, protestor claims that "the Agency should have rejected SecuriGence's Quotation as Unacceptable Under Factor 2 (Technical Approach) for its failure to comply with material Solicitation requirements," because "SecuriGence could not provide a SCIF at the time of quotation submission. Nor did it establish that it would be able to provide such a facility at the time of deployment, i.e., contract start. This material deficiency should have rendered SecuriGence's quote unacceptable, or at a minimum, warranted a rating of Low Confidence under Factor 2." In response, defendant argues that the agency's evaluation of the SCIF space in SecuriGence's proposal was reasonable. Intervenor argues that "DARPA reasonably concluded that SecuriGence did not fail to conform to the PWS's contractor furnished facilities requirements."

In Asset Protection & Security Services, L.P. v. United States, the United States Court of Appeals for the Federal Circuit recently indicated "'"a proposal that fails to conform to the material terms and conditions of [a] solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations."'" Asset Prot. & Sec. Servs., L.P. v. United States, 5 F.4th 1361, 1365–66 (Fed. Cir. 2021) (quoting Allied Tech. Grp. v. United States, 649 F.3d 1320, 1329 (Fed. Cir. 2011) (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996))); see also Centech Grp., Inc. v. United States, 554 F.3d at 1038;

Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367–68; Am. K-9 Detection Servs., LLC v. United States, No. 20-1614, 2021 WL 3626503, at *22 (Fed. Cl. Aug. 16, 2021); SigNet Techs., Inc. v. United States, No. 21-1047C, 2021 WL 2681018, at *9 (Fed. Cl. June 30, 2021); Gen. Dynamics Mission Sys., Inc. v. United States, 137 Fed. Cl. 493, 521-22 (2018); Prescient, Inc. v. United States, 125 Fed. Cl. 475, 491 (2016). In Centech, the Federal Circuit further explained that, "[t]o be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals." Centech Grp., Inc. v. United States, 554 F.3d at 1037; SigNet Techs., Inc. v. United States, 2021 WL 2681018, at *9. One trial level opinion also noted that "a court will only overturn an agency's determination that an offeror's bid satisfied the material requirements of the solicitation if such a finding was arbitrary and capricious." Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. at 505 (citing E.W. Bliss Co. v. United States, 77 F.3d at 448).

ABII claims that intervenor's revised proposal explanation demonstrates that it did not have the capability when it submitted its proposal:

> As ICD-705 accreditation has just recently become a requirement for SCI Facilities, Team SecuriGence is currently working to upgrade the [redacted] facility to receive full ICD-705 accreditation from DIA. We are 100% committed to perform any modifications necessary for our facility to be accredited, at no cost to the Government. We anticipate this will be completed prior to MNSS contract execution.

Protestor argues that

> instead of disqualifying SecuriGence as technically unacceptable for this material deficiency, DARPA erroneously assigned only a "minor" weakness to SecuriGence's Factor 2 quotation, despite DARPA's stated recognition that (1) SecuriGence's proposed contractor furnished space could not maintain its SCIF accreditation, (2) it was unclear when the proposed SCIF would be sufficiently renovated such that it could be accredited or the anticipated duration of the accreditation process, and (3) even though SecuriGence offered alternative SCIFs, there was risk that the alternatives would not meet requirements because SecuriGence failed to provide sufficient information that enabled DARPA to determine whether those alternatives met the RFQ's requirements.

This failure to determine SecuriGence's quote unacceptable, and the decision to only give a minor weakness was, according to ABII, arbitrary and capricious.

Defendant responses that "Count III fails because DARPA's evaluation of SecuriGence's approach to providing SCIF space for equipment storage under the technical factor comported with the RFQ and was reasonable," contending that the record shows that

the agency reasonably determined that SecuriGence's quote satisfied the RFQ's requirement that each quoter describe their approach to accomplishing the exemplar PWS section outlining the performance requirement to provide SCIF equipment storage space. Even though SecuriGence's quote advised that one of its existing, DARPA-approved SCIFs required upgrades to be fully accredited, the agency reasonably determined that risks associated with the timeline for those upgrades were sufficiently mitigated.

Intervenor argues "[t]his situation, therefore, is not like those in which the Court has sustained protests on the basis that the awardee failed to conform to a requirement," because "SecuriGence did not objectively propose performance below the standards required or simply fail to address the SCIF requirement. Rather, it undisputedly proposed to meet the requirement," and "SecuriGence proposed to provide a SCIF with modifications that were anticipated to be completed prior to contract execution and provided that alternative options were available in the event the modifications were not yet complete. SecuriGence promised to provide the required SCIF space, period."

The performance work statement at "3.1.1 Government Furnished Spaces/Contractor Furnished Spaces" provides:

The Government will provide the furnished space described below at Founders Square:

80 Non-SCIF workspaces.
35 SCIF workspaces.
~1500 sq. ft. of equipment storage onsite.

If additional workspace is required, the Contractor shall provide off-site space at the appropriate classification levels for their employees within the National Capital Region. The Contractor shall provide ~2000 sq. ft. of equipment storage space at a Top Secret SCI Facility within the National Capital Region.

The court notes that in discussions with DARPA, SecuriGence addressed the issue of SCIF space. Specifically in the December 7, 2020 revised, final proposal, intervenor explained:

Team SecuriGence will utilize its existing Sensitive Compartmented Information Facility (SCIF) / Special Access Program Facility (SAPF) and unclassified space on the [redacted] of the building located at [redacted]. This facility meets all the requirements listed in PWS 3.1.1. It is located [redacted] miles from the DARPA's Arlington, VA Headquarters building, providing Team SecuriGence exclusive use of an fully accredited and currently operational SCIF/SAPF that has seating for [redacted], and a

conference room ([redacted] square feet). [redacted]. As ICD-705 accreditation has just recently become a requirement for SCI Facilities, Team SecuriGence is currently working to upgrade the [redacted] facility to receive full ICD-705 accreditation from DIA. We are 100% committed to perform any modifications necessary for our facility to be accredited, at no cost to the Government. We anticipate this will be completed prior to MNSS contract execution. This facility could be used [redacted]. We also have [redacted]. In total, our facility has [redacted] square feet of usable space and approximately [redacted] for personnel. This facility [redacted]. Additionally, we have identified several alternative SCI Facilities that already have full ICD 705 accreditation and meet all PWS 3.1.1 requirements. If needed, we can utilize these other SCI Facilities to perform off-site Classified MNSS tasks prior to the [redacted] facility's ICD 705 accreditation. Regardless of final site location, we will work with DARPA Security to ensure our facility meets all current and future accreditation requirements. We also have the capability to provide [redacted] DARPA accredited SCIFs/SAPFs (Total: [redacted] square feet) at [redacted]. This facility can be used [redacted]. Evidence of Facility Accreditation can be provided to the Government upon request, in accordance with PWS 3.1.1. Between these two facilities, we can provide over 2,000 square feet of equipment storage space at the TS/SCI level within the National Capital Region.

In the Best Value Determination and Task Order Award Decision, the source selection authority noted:

For Factor 2, SecuriGence had numerous strengths with one minor weakness. SecuriGence's distinguishing features included an excellent [redacted]. In particular, the use of the [redacted] ensures [redacted]. Furthermore, SecuriGence's practice of [redacted] and will allow for [redacted]. Additionally, SecuriGence's approach to the NOSC had several strengths, most notably, [redacted] and their staffing approach that [redacted], exceeding expectations, but very beneficial to DARPA that has [redacted]. For Factor 2, SecuriGence had one minor weakness, but it does not weigh heavily against it my award decision. There is some risk to the schedule that SecuriGence has proposed for off-site secure storage. SecuriGence proposes renovations to their quoted contractor-provided facility for storage requirements will be completed prior to the start of contract. However, there are not many details to understand how SecuriGence will meet this timeline or how other mentioned rental options completely mitigate the risk. I find this risk is mitigated, for the following reasons. SecuriGence has [redacted] sq. ft. available [redacted] and DARPA has the ability to cover the remainder of requirement while any final renovations are made or other space is rented. In addition, considerable time has passed since SecuriGence's initial quote submission, their final quote submission, and more time will pass by before the period of

performance starts reducing the risk their required improvements and accreditation will not occur on-time as quoted. Other potential local options were also mentioned by SecuriGence, and although there were not detailed enough to completely eliminate the risk, based on Government knowledge, and in my business judgement, it is likely SecuriGence will be able to rent additional local space, as quoted, in time to meet PWS requirements should their other proposed facility not be ready. I also noted that SecuriGence is [redacted]. These strengths, along with others, one minor weakness (which I believe is sufficiently mitigated), and no deficiencies noted, led me to assign SecuriGence a High Confidence rating for Factor 2.

(capitalization in original).

As explained by the Federal Circuit in <u>Allied Technology</u>:

Where an offeror has certified that it meets the technical requirements of a proposal, the Contracting Officer is entitled to rely on such certification in determining whether to accept a bid, and the offeror's potential failure to comply with the proposal requirements is ordinarily "a matter of contract administration," which does not go to the propriety of accepting the bid. <u>See Centech</u>, 554 F.3d at 1039 (citing with approval <u>In re Orincon Corp.</u>, B-276704, 1997 WL 402081 (G.A.O. July 18, 1997)) ("[A]s a general matter, an agency's judgment as to whether a small business offeror will comply with the subcontracting limitation is a matter of responsibility, and the contractor's actual compliance with the provision is a matter of contract administration."). "However, where a proposal, *on its face,* should lead an agency to the conclusion that an offeror could not and would not comply with the [applicable requirement], we have considered this to be a matter of the proposal's technical acceptability," which *does* affect the propriety of accepting the offer. <u>Id.</u> (emphasis added).

<u>Allied Tech. Grp., Inc. v. United States</u>, 649 F.3d 1320, 1330–31 (Fed. Cir. 2011). Intervenor argues "it undisputedly proposed to meet the requirement." As indicated above, SecuriGence proposal demonstrates that:

Team SecuriGence will utilize its existing Sensitive Compartmented Information Facility (SCIF) / Special Access Program Facility (SAPF) and unclassified space on the [redacted] of the building located at [redacted]. This facility meets all the requirements listed in PWS 3.1.1. It is located [redacted] miles from the DARPA's Arlington, VA Headquarters building, providing Team SecuriGence exclusive use of an fully accredited and currently operational SCIF/SAPF that has seating for [redacted], and a conference room ([redacted] square feet). [redacted]. As ICD-705 accreditation has just recently become a requirement for SCI Facilities, Team SecuriGence is currently working to upgrade the [redacted] facility to receive full ICD-705 accreditation from DIA. We are 100% committed to perform any modifications necessary for our facility to be accredited, at no

cost to the Government. We anticipate this will be completed prior to MNSS contract execution. This facility could be used [redacted]. We also have [redacted]. In total, our facility has [redacted] square feet of usable space and approximately [redacted] for personnel. This facility [redacted]. Additionally, we have identified several alternative SCI Facilities that already have full ICD 705 accreditation and meet all PWS 3.1.1 requirements. If needed, we can utilize these other SCI Facilities to perform off-site Classified MNSS tasks prior to the [redacted] facility's ICD 705 accreditation. Regardless of final site location, we will work with DARPA Security to ensure our facility meets all current and future accreditation requirements. We also have the capability to provide [redacted] DARPA accredited SCIFs/SAPFs (Total: [redacted] square feet) at [redacted]. This facility can be used [redacted]. Evidence of Facility Accreditation can be provided to the Government upon request, in accordance with PWS 3.1.1. Between these two facilities, we can provide over 2,000 square feet of equipment storage space at the TS/SCI level within the National Capital Region.

The facts of the above captioned protest are different than cases in which courts have found that an offeror failed to conform to a requirement of a solicitation. For example, the Federal Circuit recently held in <u>Asset Protection & Security Services, L.P. v. United States</u> that an offeror who did not submit all the required documentation with its proposal did not submit a bid that conformed with the requirements of the solicitation. <u>See</u> <u>Asset Prot. & Sec. Servs., L.P. v. United States</u>, 5 F.4th at 1366.[8] The Federal Circuit explained:

Asset admits that its bid includes an error. ICE's solicitation required bidders to "[e]xplain in detail all pricing and estimating techniques." Asset's description of its pricing, explaining that it was expecting the government to provide a tax-exempt certificate, was not consistent with the solicitation as amended. Asset essentially argues that this error was harmless. First, it argues that its bid price was unaffected by the error given that the solicitation, "through its firm fixed price requirement, established that an offeror's firm fixed price proposal made an offeror responsible for all costs of contract performance, irrespective of whether or not the offeror factored a specific cost into its calculation of its firm fixed price." Asset points out that a firm fixed price contract places "maximum risk and full responsibility for all costs and resulting profit or loss" on the offeror. (quoting 48 C.F.R. § 16.202-1; then citing <u>ITT Fed. Servs. Corp. v. Widnall</u>, 132 F.3d 1448, 1451 (Fed. Cir. 1997)). Second, Asset contends that its bid did not set a contingent price. Third, Asset argues that the solicitation did not require a price-realism analysis. On appeal, the government does not appear to dispute any of these three points. Instead, it argues that "Asset's proposal was

---

[8] The court notes that the trial court decision in <u>Asset Protection</u> was decided by the undersigned. <u>See</u> generally <u>Asset Prot. & Sec. Servs., L.P. v. United States</u>, 150 Fed. Cl. 441 (2020), <u>aff'd</u>, 5 F.4th 1361 (Fed. Cir. 2021)

unacceptable on its face" and, as a result, could not have been selected and was ineligible for award of the contract. Asset thus "lack[ed] standing to challenge the agency's decision to award the contract to Akima." Id.

Under our cases, "a proposal that fails to conform to the material terms and conditions of [a] solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." Allied Tech. Grp. v. United States, 649 F.3d 1320, 1329 (Fed. Cir. 2011) (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996)). The government argues that compliance with the amendments relating to the unavailability of a tax-exempt certificate constituted a material term of the solicitation because, absent compliance, there would be a significant ambiguity in the terms of any purported agreement. We agree. Given the mismatch between the terms of ICE's solicitation and Asset's bid, any agreement formed would fail to "satisfy the requirement of reasonable certainty applicable to the essential terms of all contracts." Pac. Gas & Elec. Co. v. United States, 838 F.3d 1341, 1355–56 (Fed. Cir. 2016); see also United Pac. Ins. Co. v. Roche, 401 F.3d 1362, 1366 (Fed. Cir. 2005) ("In the absence of . . . sufficiently definite terms, no contractual obligations arise." (quoting Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 202 (Fed. Cir. 1992))).

Asset Prot. & Sec. Servs., L.P. v. United States, 5 F.4th at 1365–66 (internal references omitted).Similarly in Afghan American Army Services Corp., a Judge of the United States Court of Federal Claims noted that

> there was substantial confusion over whether HEB's [HEB International Logistics (an awardee)] proposal met the minimum ping rate requirements for the ITV system. The agency conducted discussions with HEB about its proposed ITV plan, and HEB replied: "Due to the slow speeds normally run on Afghan roads, HEB has chosen the '15 minute ping rate.' Anything less would be excessive with little to nothing to show for the incurred cost." That would be fine, if a "15 minute ping rate" were an option that could be chosen under the RFP. But what the RFP required was, for convoys exceeding four vehicles, "two vehicles equipped with [a] panic button and two-way voice capability" and that these two vehicles "must have a ping rate of no less than five minutes." Other vehicles in the convoy could have a GPS tracking device and a ping rate of 15 minutes, but for those two specific security vehicles, the RFP did not permit a 15–minute option.

Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 362. After review of the record, the Judge concluded

> HEB never specifically stated that it would provide a five-minute ping rate, and thus its proposal failed to meet a mandatory requirement of the solicitation. The United States Court of Appeals for the Federal Circuit has

stated that "[i]n negotiated procurements, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." E.W. Bliss Co., 77 F.3d at 448 (citations omitted); see also ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 71 (2001) (stating that a materially noncompliant proposal cannot form the basis for award). HEB's proposal did not even purport to meet a mandatory term of the solicitation, and as such the award to HEB violated "clearly applicable procurement statutes and regulations." Alfa Laval, 175 F.3d at 1367–68 (finding that waiving a mandatory solicitation requirement for one offeror was a violation of "clearly applicable procurement statutes and regulation"); Blackwater Lodge, 86 Fed. Cl. at 505 ("A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the bid.").

Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 363. Intervenor's proposal offered the agency sufficient SCIF space to meet the requirements of the RFQ.

Protestor also argues that "SecuriGence could not provide a SCIF at the time of quotation submission." In response, intervenor argues "there was no requirement in the RFQ to have the SCIF space ready for performance *at the time of quotation submission*— much less to have full ICD 705 accreditation at that time," and contends that "[t]here would be no logical reason for any such requirement and, not surprisingly, no such requirement is stated in the Solicitation." (emphasis in original). As noted above, the performance work statement at "3.1.1 Government Furnished Spaces/Contractor Furnished Spaces" provides:

The Government will provide the furnished space described below at Founders Square:

80 Non-SCIF workspaces.
35 SCIF workspaces.
~1500 sq. ft. of equipment storage onsite.

If additional workspace is required, the Contractor shall provide off-site space at the appropriate classification levels for their employees within the National Capital Region. The Contractor shall provide ~2000 sq. ft. of equipment storage space at a Top Secret SCI Facility within the National Capital Region.

The plain language of the performance work statement, however, does not require the "~2000 sq. ft. of equipment storage space at a Top Secret SCI Facility within the National Capital Region additional workspace" to be available at the time the proposal was submitted.

Protestor, citing to a different section of the RFQ, section 7.10, notes that section 7.10 requires that "Facility clearance must be current at time of quotation submission, and the Government will not sponsor facility clearances in anticipation of this award." As intervenor, notes, however, "the SCIF is a separate and distinct requirement from the facility clearance requirement," and "Section 7.10, on its face, does not require the proposed SCIF—which is required by a different part of the Solicitation (PWS section 3.1.1)—to be ICD 705 accredited and available at the time of quotation submission." Moreover, the facility clearance was a requirement of Phase I of the RFQ, as the offerors had to "provide a copy of its letter from the Defense Counterintelligence and Security Agency (DCSA), Facility Clearance Branch that grants its facility clearance level at the Top Secret level." The court notes that in the Phase I evaluation, DAPRA determined it had "Substantial Confidence" in SecuriGence.

Defendant argues, "Agile-Bot's argument that the agency should have rejected SecuriGence's quote is mere disagreement with the agency's considered judgment that the risks associated with the construction timelines for the [redacted] facility SCIF upgrades were sufficiently mitigated." The court agrees. The agency's evaluation of SecuriGence's proposal regarding the SCIF space was not unreasonable, and DARPA fully explained in its decision that DARPA would have the secure resources it required for contract performance, which, therefore, warranted a finding of a minor weakness, not disqualification of SecuriGence's proposal. The court does not believe that SecuriGence's proposal failed to conform to the material terms of the RFQ, and the decision not to find SecuriGence's proposal unacceptable was reasonable.

Disparate Treatment

For Count 4, ABII argues that "the Agency treated ABII and SecuriGence disparately in its evaluation of Factor 3 (Management Approach) Quotations," and defendant argues that the "record establishes that the agency did not treat SecuriGence and Agile-Bot disparately." As to the protestor's disparate treatment argument, clearly, "it is beyond peradventure that a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." Banknote Corp. of Am. v. United States, 56 Fed. Cl. at 383 (citing Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 569 (2000) (citing cases)); see also Chenega Mgmt., LLC v. United States, 96 Fed. Cl. at 585 ("[U]nequal treatment claims are the 'quintessential example of conduct which lacks a rational basis.'" (emphasis in original) (quoting Hunt Building Co., Ltd. v. United States, 61 Fed. Cl. 243, 273)). "Equal treatment, however, does not require that all proposals be treated the same." Chenega Mgmt., LLC v. United States, 96 Fed. Cl. at 585 (citing FAR 1.102–2(c)(3) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same.")). Instead, "'an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.'" Redland Genstar, Inc. v. United States, 39 Fed. Cl. 220, 234 (1997) (quoting Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996)). As recently explained by the United States Court of Appeals for the Federal Circuit,

To prevail at the Claims Court, a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were "substantively indistinguishable" or nearly identical from those contained in other proposals. See Enhanced Veterans Solutions, Inc. v. United States, 131 Fed. Cl. 565, 588 (2017); see also Red River Comput. Co. v. United States, 120 Fed. Cl. 227, 238 (2015); Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 272 (2012); Chenega Mgmt., LLC v. United States, 96 Fed. Cl. 556, 585 (2010); Hamilton Sundstrand Power Sys. v. United States, 75 Fed. Cl. 512, 516 (2007). A protestor may also prevail by showing that the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines. See Sci. Applications Int'l Corp., 108 Fed. Cl. at 272 (citing BayFirst Sols., LLC v. United States, 102 Fed. Cl. 677 (2012)).

We see no reason to depart from the Claims Court's "substantively indistinguishable" standard. If a protestor meets this threshold, a reviewing court can then comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters. See, e.g., COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1384 (Fed. Cir. 2012). If a protestor does not, then the court should dismiss the claim. To allow otherwise would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings. This is not the court's role. E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (noting that the court "will not second guess" the "minutiae of the procurement process in such matters as technical ratings . . ., which involve discretionary determinations of procurement officials").

Off. Design Grp. v. United States, 951 F.3d 1366, 1372–73 (Fed. Cir. 2020) (footnote omitted).

ABII argues that the amended Administrative Record "confirms that DARPA treated ABII and SecuriGence disparately by failing to credit ABII for a quotation feature that SecuriGence received a strength for under Factor 3 (Management Approach), even though that feature was also present in ABII's quotation." Protestor continues:

DARPA assessed SecuriGence the following strength under Factor 3(d)– Recruitment/Retention Strategies, based on SecuriGence's proposed reliance on one specialized staffing firm, because this reliance would "lower the time it takes to hire qualified personnel":

Team SecuriGence teammate, [redacted], is a staffing firm that specializes in hiring IT and Engineering professionals (Section 3.4.1, Page 3-13). This should lower the time it takes to hire qualified personnel.

64

ABII did not receive a corresponding strength for proposing this feature in a superior manner within its own Factor 3 quotation. Specifically, ABII explained that it had tailored its recruiting approach directly to the needs of DARPA as outlined in the RFQ, noting that it would utilize [redacted] specialized recruitment vendors (both local and national), one of which ([redacted]) was dedicated to recruiting technical personnel like SecuriGence's [redacted]:

[redacted]

As such, ABII should have received a similar strength for its utilization of specialized recruiting firms that would "lower the time it takes to hire qualified personnel."

Defendant argues that the

record establishes that the agency did not treat SecuriGence and Agile-Bot disparately in assigning a strength for SecuriGence's teaming with a specialized staffing firm while declining to assign a similar strength for Agile-Bot's approach to working with specialized recruiting firms. Rather, the differing strength assignments are the result of the agency's reasonable assessment of differing aspects of their quotes.

Defendant also argues

[i]n the portion of SecuriGence's quotation addressing recruitment/retention strategies, it detailed its teaming arrangement with [redacted] and the specific benefits of that arrangement to its recruitment/retention approach. In stark contrast, while Agile-Bot's quotation provided that it works with specialized recruiting firms, it does not provide any additional information about these firms, its relationships with them, or any specific benefits from working with them.

(internal citation omitted). Intervenor argues that "SecuriGence and ABII proposed the use of different staffing firms. SecuriGence proposed [redacted] in particular as a teammate, while ABII did not," and "it was reasonable for DARPA to mention [redacted] in the Strength it assigned SecuriGence's evaluation while not specifically mentioning the staffing firms proposed by ABII in the Strength DARPA assigned to ABII, in light of SecuriGence's more detailed discussion of [redacted]." Intervenor contends that "[t]his does not change the fact that DARPA assigned strengths to both ABII and SecuriGence for their respective recruitment and retention strategies."

For Factor 3, the source selection authority explained:

For **Factor 3 (Management Approach),** ABII and SecuriGence each receive a High Confidence rating. For Factor 3, [redacted] receives a Medium Confidence rating. For Factor 3, I have high confidence that ABII and SecuriGence understand the requirement, propose a sound approach, and will be successful in performing the task order. For Factor 3, I have some confidence that [redacted] understands the requirement, proposes a sound approach, and will be successful in performing the task order.

For Factor 3, ABII's management approach strategies, taken in aggregate, form a comprehensive portfolio of recruitment, training, incentives, and compensation that should result in hiring and retaining a high-quality MNSS staff. Likewise, for Factor 3, ABII has a robust plan for quality control to include well-defined quality management and service level objective responsibilities and the ability to reach-back for corporate support. Additionally, for Factor 3, ABII has a sound product team structure that also adds value by providing a [redacted] that will help ensure DARPA is able to rapidly evolve to emerging DoD mandates.

For Factor 3, SecuriGence's proposed [redacted] aligns the staff to the mission and [redacted]. In addition, SecuriGence's approach provides value with [redacted] and [redacted] to reduce the burden for [redacted] while also providing [redacted]. Overall, for Factor 3, I believe that SecuriGence's approach to recruitment, training, incentives, and compensation should result in hiring and retaining a high-quality MNSS staff.

(emphasis in original). The source selection authority concluded: "Therefore, I assigned ABII and SecuriGence High Confidence ratings for Factor 3, and I assigned [redacted] a Medium Confidence rating for Factor 3."

The amended Administrative Record demonstrates that staffing proposals offered by ABII and SecuriGence were not "substantively indistinguishable." The SecuriGence proposal explained that

[redacted], is a premier staffing firm that specializes in talent placement of IT and Engineering professionals. Having been [redacted] has the proven ability to find and capture IT and Systems/Network Engineers to meet planned and unplanned DARPA MNSS vacancies requirements. In fact, [redacted]

(capitalization and emphasis in original). The proposal continued:

With [redacted] within its [redacted] and Team SecuriGence's recruiters can rapidly identify backfills and more quickly fill a position. This streamlines the [redacted]

Finally, SecuriGence's proposal noted that "Team SecuriGence's collective recruiting team consists of a pool of [redacted] recruiters experienced in hiring cleared IT professionals with immediate access to [redacted] extensive IT and Engineering network."

The Technical Evaluation Board found in its evaluation of intervenor: "Team SecuriGence teammate, [redacted], is a staffing firm that specializes in hiring IT and Engineering professionals (Section 3.4.1, Page 3-13). This should lower the time it takes to hire qualified personnel." By contrast, ABII's proposal specifically noted that "[r]ather than automatically defaulting to the largest staffing firm, we work with specialized recruiting firms that understand the talent landscape, including [redacted]." ABII's proposal appears to have made the decision not to work with a large staffing company like [redacted] and the amended Administrative Record does not indicate any additional specific information about the companies ABII intended to work with for staffing. Therefore, the proposals submitted by ABII and SecuriGence were not "substantively indistinguishable," and the agency did not engage in disparate treatment in the evaluation of Factor 3: Management Approach. See Off. Design Grp. v. United States, 951 F.3d at 1373.

Best Value

Regarding the best value determination, protestor argues "DARPA's best value tradeoff and Source Selection Decision were arbitrary and capricious and conducted in a manner contrary to law," because "[i]n light of the numerous errors in DARPA's price and technical evaluations explained above, DARPA necessarily conducted an arbitrary and capricious best value trade-off resulting in an erroneous award decision where the tradeoff relied on the flawed underlying evaluations." Defendant responds that "DARPA's best-value determination and award decision was reasonable," and intervenor argues "ABII does not allege any errors in the best value determination beyond the alleged impact on the best value determination of the claimed improprieties in the underlying evaluation."

As indicated above, the United States Court of Appeals for the Federal Circuit also has explained that procurement officials have a greater degree of discretion when it comes to best-value determinations, as compared to a procurement based on price alone. See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); see also Croman Corp. v. United States, 724 F.3d at 1363 (noting the significant discretion contracting officers possess when awarding contracts on the basis of best value to the agency) (citing Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355); CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996)); Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327–28 (Fed. Cir. 1996))); Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; E.W. Bliss Co. v. United States, 77 F.3d at

449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); AM Gen., LLC v. United States, 115 Fed. Cl. 653, 697 (2014); Amazon Web Servs., Inc. v. United States, 113 Fed. Cl. 102, 110 (2013) ("Contracting officers are afforded 'an even greater degree of discretion when the award is determined based on the best value to the agency.'" (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330)); Akal Sec., Inc. v. United States, 103 Fed. Cl. 310, 329 (2011) ("The United States Court of Appeals for the Federal Circuit has recognized that '[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government.' " (quoting E.W. Bliss Co. v. United States, 77 F.3d at 449)); Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009).

In E.W. Bliss Co. v. United States, the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review in best-value determinations:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. See Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993); cf. Widnall v. B3H, 75 F.3d 1577 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason . . . even if the Board itself might have chosen a different bidder"); In re General Offshore Corp., B–251969.5, B–251969.6, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).
>
> . . .
>
> Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess. See Lockheed Missiles & Space Co., 4 F.3d at 958; Grumman Data Systems Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.").

E.W. Bliss Co. v. United States, 77 F.3d at 449; see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 908 (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); COMINT Sys. Corp. v. United States, 700 F.3d at 1384 (quoting same); Tyler Constr. Grp. v. United States, 570 F.3d at 1334 (citing same); CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting same); Galen Med. Assoc., Inc. v. United States,

369 F.3d at 1330 (quoting same); <u>R & W Flammann GmbH v. United States</u>, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing same); <u>Vanguard Recovery Assistance v. United States</u>, 101 Fed. Cl. at 780; <u>Galen Med. Assocs., Inc. v. United States</u>, 74 Fed. Cl. 377, 383–84 (2006).

As indicated above, the court has found that DARPA's price and technical evaluations were not arbitrary and capricious, and therefore, does not agree with protestor's contention that "DARPA necessarily conducted an arbitrary and capricious best value trade-off resulting in an erroneous award decision where the tradeoff relied on the flawed underlying evaluations." Moreover, the Best Value Determination and Task Order Award Decision was well reasoned and through. The decision began by noting

> [i]n determining the best value, in accordance with FAR 8.4, I utilized a trade-off process between the evaluation factors in the order of relative importance specified in the RFQ. My task order decision considers recommendations from the Technical Evaluation Board (TEB) and Price/Cost Evaluation Board (PCEB), but represents my own independent judgment of each quote. I agree with the TEB and PCEB analysis and ratings and will not re-state their findings; rather, in this memorandum I will generally focus on the distinguishing features within each quote that weighed most heavily on my best value determination and task award decision.

By way of example, for Factor 7 in the trade-off analysis, the source selection authority stated: "For **Factor 7 (Price/Cost),** I concur with the Price/Cost Evaluation Board's assessment that all three Quoters' quotes are fair and reasonable. Concerning realism, I find little to no risk with ABII's and SecuriGence's quotes. I find that [redacted], however, has some risk associated with realism." (emphasis in original). The source selection authority continued:

> For Factor 7, from a trade-off perspective, I find ABII and SecuriGence to be essentially equal in realism risk, and both are higher priced than [redacted]. As between ABII and SecuriGence, however, my consideration of Factor 7 additionally included an increased relative importance of Factor 7 due to the closeness in the merit of ABII's and SecuriGence's quotes for Factors 1-6. I also considered the price premiums associated with ABII's quote compared to SecuriGence's quote; and the price premium of SecuriGence's quote compared to [redacted] quote. These considerations are further discussed below.

> For Factors 1-6, overall, I found the technical quotes of ABII and SecuriGence to be very close in merit and essentially tied for these Factors. Therefore, in accordance with the RFQ, I increased the relative importance of Factor 7 (Price/Cost) in my trade-off analysis and comparison of the quotes of ABII and SecuriGence. On the other hand, for Factors 1-6, overall, I found the technical quote of [redacted] to be significantly lower in value to

DARPA than the quote for SecuriGence (and ABII). I did not increase the relative importance of Factor 7 (Price/Cost) in my trade-off analysis and comparison of the quotes of SecuriGence (and ABII) and [redacted]. I did, however, take note that [redacted] total evaluated price is lower than the total evaluated price for ABII and for SecuriGence. The following table restates the total evaluated prices for ABII, SecuriGence, and [redacted]:

Table 4. Summary of Total Evaluated Prices for Phase II Quoters.

| Phase II Quoter | Total Evaluated Price* |
|---|---|
| ABII | $819,569,555** |
| SecuriGence | $781 997,009 |
| [redacted] | $[redacted] |

* Prices rounded to the nearest dollar.
** ABII's total price with non-compliant quoted revisions to its MNSS base fees was $[redacted].

The source selection authority explained:

As documented in Table 4, I found that ABII's total evaluated price is higher than either SecuriGence's or [redacted] total evaluated price. Relevantly, ABII's total evaluated price is approximately $37.6M higher than SecuriGence, which is approximately $4M per year higher over the potential 9.5-year period of performance (PoP) of the task order. Even if I accepted ABII's non-compliant quote revision, which I do not, ABII's total quoted price is still up to $[redacted] higher than SecuriGence's total evaluated price, or about $[redacted] over the potential 9.5-year PoP of the task order. Thus, per the RFQ's evaluation rating scheme, and as discussed below, in view of my decision to increase the importance of price/cost in my award decision, I carefully considered whether the $37.6M price premium of ABII's quote was within the price premium in terms of additional technical value to DARPA compared to the equally technically rated but significantly lower-priced quote of SecuriGence.

Also, as documented in Table 4, I found that SecuriGence's total evaluated price is approximately $25.4M higher than the total evaluated price of [redacted]. As discussed above, for Factors 1-6, I found SecuriGence's quote to be of significantly higher value to DARPA than [redacted] quote. Therefore, per the RFQ, I did not increase the relative importance of Factor 7 (Price/Cost) in my trade-off analysis between these two Quoters, e.g., per the RFQ, Factor 7 remained as the least important factor. Nevertheless, out of prudence, and as a steward of taxpayers' dollars, I considered whether the $25.4M cost premium of SecuriGence's higher rated technical quote offered DARPA additional technical value over [redacted] lower-rated technical quote.

Considering SecuriGence's and ABII's price quotes from a trade-off perspective, and considering my decision to increase the relative importance of Factor 7 for these two quotes, and further considering that I find the technical quotes of these two Quoters to be essentially tied, I determined that ABII's higher-priced quote is not worth its higher price to DARPA compared to SecuriGence's equally highly rated but significantly lower-priced quote. As summarized by my adjectival ratings in Table 1 and trade-off summary for Factors 1-6 above, I found ABII and SecuriGence to be equally highly rated and essentially tied for these Evaluation Factors. I carefully considered any potential technical differentiators between the two quotes. For instance, for Factor 2 (Technical Approach) I considered SecuriGence's weakness for its off-site secure space approach. Although I believe this weakness to be sufficiently mitigated, I nevertheless weighed it from a price premium perspective ( e.g., Was it worth for DARPA to pay up to $37.6M more and award ABII and avoid this weakness in SecuriGence's quote? My answer: No.). Under Factor 5 (Past Performance), I also considered that SecuriGence had five (5) past performance submissions versus the six (6) past performance submissions for ABII. Although I did not find the fact that SecuriGence five past performance submissions to be a weakness, I weighed it from a price premium perspective to ensure that I considered any potentially distinguishing technical feature between ABII's and SecuriGence's technical quotes (e.g., Was it worth it for DARPA to pay up to $37.6M more and award to ABII because it provided one more past performance submission than SecuriGence? My answer: No). Based on my review, I did not identify any technical feature or a combination of technical features of ABII's quote that, in my business judgement, would justify DARPA spending up to $37.6M, or about $4M per year more on ABII's quote compared to SecuriGence's quote which I believe offers DARPA essentially equal value at a significantly less price. Even if I would have accepted ABII's non-compliant quote revisions, which I do not, its price premium compared to SecuriGence's quote is still $[redacted], or about $[redacted] per year. In comparing the quotes of ABII and SecuriGence from the perspective of its non-compliant price quote, I still found little, if anything, in ABII's technical quote that would justify DARPA spending up to $[redacted], or $[redacted] per year more than it would for SecuriGence's' [sic] quote which offers equal value at a significantly lower price. Therefore, I concluded that ABII's quote is not worth its $37.6M price premium, or even a $[redacted] price premium, over SecuriGence's equally highly rated but significantly lower-priced quote. My conclusion is reinforced by my decision to increase the relative importance of Factor 7 (Price/Cost) based on my finding that the quotes for ABII and SecuriGence are essentially tied for Evaluation Factors 1-6. In my judgment, from a price premium and price/cost trade-off perspective. SecuriGence's quote offers greater value to DARPA than ABII's quote.

Considering SecuriGence's and [redacted] price quotes, and in view of my decision not to increase the relative importance of Factor 7 for these two quotes, and fu1ther considering that I find SecuriGence's technical quote under Factors 1-6 to be significantly higher rated than [redacted] technical quote, I nevertheless still considered whether SecuriGence's quote offers DARPA additional technical value that justifies its $25.4M price premium, or about $2.7M per year. I found that SecuriGence's quote offers DARPA additional technical value that justifies its price premium compared to [redacted] quote.

The Best Value Determination and Task Order Award Decision concluded:

After independently considering the evaluation ratings and the particular merits and risks associated with each final quote revision, I determine that SecuriGence's quote provides the best value to the Government. My best value determination takes into consideration the RFQ's evaluation factors in descending order of importance, increasing the relative importance of Factor 7 for ABII and SecuriGence's quotes due to their closeness in technical merit, and considering all of the aforementioned distinguishing features of the Quotes.

ABII and SecuriGence had the same adjectival ratings for all factors and included very similar distinguishing factors that did not significantly influence my decision for either Quoter. As I have documented in my discussion above, I found ABII and SecuriGence to be essentially tied for Evaluation Factors 1-6. Therefore, the respective strengths and risks resulted in ABII's and SecuriGence's quotes being extremely close in technical merit in my trade-off analysis and, as discussed above, led me the relative importance of price/cost Factor 7 in my award decision. As I also discuss above, I did not find that the up to $37,572,546, or about $4M per year, price premium of ABII's quote was worth its premium over SecuriGence's quote given that SecuriGence's quote offers DARPA essentially the same technical value at a much lower price. I have equal confidence that ABII and SecuriGence understand the requirement, proposed a sound approach, and could be successful in performing the task order. I selected SecuriGence over ABII because I found no persuasive additional technical advantages in ABII's quote that, in my judgment, were worth its much higher price compared to SecuriGence's quote. Thus, I find that SecuriGence's quote offers better value to DARPA than ABII's quote.

I agree with the Contracting Officer's decision to reject the non-compliant portion of ABII's final quote that decreased the base fee on the Multi-Network Support Services. As stated by the Contracting Officer, I agree that it would be unfair to the other Quoters, and in my opinion, detrimental to the integrity of the procurement system, if the price/cost team determined ABII's non-compliant revisions to its price quote were compliant (e.g., within the scope of the Exchange Notice) and evaluated it as part of determining ABII's

revised quoted price. However, even if the quote revision of reducing base fee had been compliant with the Exchange Notice, which it was not, it still would not have changed my best value decision. More specifically, even with a price premium of up to $[redacted], or about $[redacted] per year, ABII's quote would still not be worth awarding over SecuriGence's quote which offers essentially equal technical value at a much lower price. Thus, even if I would have accepted ABII's non-compliant price revisions, which I do not, I would still find that SecuriGence's quote offers better value to DARPA than ABII's quote.

I found that SecuriGence's quote to be much higher rated in technical merit than [redacted] quote. So, per the RFQ, I did not increase the relative importance of price/cost Factor 7 in my comparison of SecuriGence's and [redacted] quotes. For SecuriGence's versus [redacted] quotes, Factor 7 remained as the least important Evaluation Factor. But out of prudence, and mindful of my duty as a steward of taxpayer's funding, I nevertheless considered the price premium of SecuriGence's quote to confirm that it was, in my judgement, worth its extra price to DARPA. As documented above, I found SecuriGence's higher-rated quote to be worth its $[redacted], or about $[redacted] per year, price premium compared to [redacted] lower rated but lower priced quote. My finding was based on my consideration of [redacted] lower overall ratings for several of the Evaluation Factors, including for Factor 3 where there were significant weaknesses related to [redacted] within its staffing plan; for Factor 4 where minimum requirements for the [redacted] were not met, for Factor 5 where there was [redacted] for a Very Relevant contract; and for Factor 7 whether there was some realism risk. I am much more confident in SecuriGence than [redacted] that SecuriGence understands the requirement, proposes a sound approach, and will be successful in performing the task order. I determined that it is more valuable to DARPA to pay the price premium for a Quoter (SecuriGence) that I am fully confident is able to successfully perform all MNSS requirements than to award to a Quoter ([redacted]) that I am not confident can successfully perform all MNSS requirements, particularly given how critical MNSS services are to carrying out DARPA's mission to maintain technological superiority over our adversaries. I have identified and documented technical features of SecuriGence's quote that support my price premium determination. Thus, I find that SecuriGence's quote offers better value to DARPA than [redacted] quote.

Therefore, for the three quotes evaluated under the Phase II of the RFQ:

1. I rank SecuriGence as first in line for the task order award.
2. I rank ABII as second in line for the task order award.
3. I rank [redacted] as third in line for the task order award.

**Award Decision**

I have directed the Contracting Officer to award the task order to SecuriGence in the amount of $734,813,243. This dollar amount is lower than the above total evaluated price ($781,997,009) because it does not include the FAR 52.217-8 six-month extension in the amount of $47,183,766.

(emphasis in original). The source selection authority explained in detail why a comparison of the price/factor was necessary, even though it was the least important factor in the RFQ, and provided a thorough explanation for why SecuriGence's proposal was the best value for the government compared to ABII and [redacted]. The Best Value Determination and Task Order Award Decision was reasonable and, given the degree of discretion when it comes to best-value determinations, the court cannot agree with protestor's allegation that best value trade-off was arbitrary and capricious. See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330.

## CONCLUSION

As described above, based on the urgency described by the defendant, and as indicated to the parties previously in an oral decision, which is memorialized above, the court found that the agency's actions were not arbitrary and capricious and, therefore, protestor's motion for judgment on the amended Administrative Record was denied. Defendant's and intervenor's cross-motions for judgment on the amended Administrative Record were granted. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**